GODFREY LESSIEUR, ABRAM AUGUSTINE AND MARY W. HIS WIFE, THOMAS H. DAWSON, RICHARD J. WATSON AND SARAH HIS WIFE, AND PALMELIA E. DAWSON, LAURA A. DAWSON AND GEORGE W. DAWSON, INFANTS, BY THOMAS H. DAWSON THEIR GUARDIAN, PLAINTIFFS IN ERROR, v. THOMAS PRICE.

Where the highest court of a State affirmed the judgment of the court below, in consequence of an equal division between the judges thereof, such judgment of

affirmance is considered, when the case is brought here under the twenty-fifth section of the Judiciary Act, as an affirmance of the rulings of the court below.

Under the act of the 17th February, 1815, (3 Stat. at Large, 211,) for the relief of the inhabitants of New Madrid County, who suffered by earthquakes, a notice of location given to the Surveyor-General was not sufficient to vest the title in the applicant; the title was not complete until the plat and certificate of survey were filed and recorded in the Recorder's office. An exchange of titles then at once took place. The applicant became entitled to his new location, and the land which he abandoned reverted to the United States.

But if the claim, under a New Madrid certificate, be prosecuted by an agent without the knowledge of the principal, the title to the new land cannot vest in the principal until he assents to and adopts the proceedings of his agent; because, by such assent, he relinquishes the title to the land which he first owned.

In 1820, Congress granted to the State of Missouri, (3 Stat. at Large 547,) four sections of land, which should, "under the direction of the legislature, be located, as near as may be, in one body, at any time, in such townships and ranges as the legislature may select, on any of the public lands of the United States: Provided, that such locations shall be made prior to the public sale of the lands of the United States surrounding such location."

This grant did not need an application to an officer of the United States for permission to locate it. When the legislature selected the land, and gave notice thereof to the Surveyor-General and Recorder of the Land-District, the land became identified and the title complete.

In making the selection, the legislature had a right to include fractional parts of sections, until the entire amount of four sections was made up.

The time at which the title of the State became complete, was the day on which the Governor notified the Surveyor-General of the selection of the land by commissioners who had been appointed for that purpose.

THIS case was brought up from the Supreme Court of the State of Missouri by a writ of error, issued under the 25th section of the Judiciary Act.

It was an ejectment brought by the plaintiffs in error, in the Circuit Court of Cole County, (State Court of Missouri,) to recover lot No. 455, as known and described upon the plat of the city of Jefferson, lying and being at a corner formed by the intersection of Washington and High Streets. Both parties claimed to derive title from the United States. The cause was submitted to the Circuit Court of Cole County, as a jury, and the judgment being for the defendant, the plaintiffs carried it to the Supreme Court of Missouri, where the judgment of the court below was affirmed by a divided court; one judge not sitting, one being for affirming the judgment, and one dissenting. The plaintiffs then brought the case to this court by writ of error.

The bill of exceptions, which was taken to the rulings of the court upon the trial of the cause in Cole County, sets forth, *in extenso*, sundry papers, the insertion of which does not appear necessary in this report. A summary of the evidence offered, together with the prayers to the court, seems to be all that is required.

Upon the trial in the Circuit Court, the plaintiffs gave in evidence the following chain of title, to wit:

1. A confirmation made by the Board of Commissioners, on

the 8th of January, 1811, of two hundred arpens of land, in the county of New Madrid, to Baptiste Delisle, as described in a plat of survey certified the 27th of February, 1806.

2. The commissioners' or New Madrid certificate, issued 20th of November, 1817, to Baptiste Delisle, for two hundred arpens, in lieu of his land, injured by earthquakes, lying in the county of New Madrid.

3. A notice of location given to the Surveyor-General, by Thomas Hempstead, and A. L. Langham, as the legal representatives of Baptiste Delisle, dated 2d June, 1821, that they had located two hundred arpens under the foregoing certificate, " so as to include fractional section number six, the northeast fractional quarter of fractional section number seven, and as much off the north part of the west fractional half of fractional section number eight, as will make the quantity of two hundred arpens, all in township number forty-four, north of the base line of range number eleven, west of the fifth principal meridian, south of the Missouri River."

4. A survey made by the Deputy-Surveyor of the above location, dated 5th of August, 1821, and filed 11th of February, 1822.

5. Patent certificate, dated 25th of February, 1822, and delivered to Charles L. Hempstead.

6. Patent from the United States to Baptiste Delisle, dated the 13th of November, 1822.

7. Deed from Delisle and wife to Robert D. Dawson and Godfrey Leissieur, for the land patented to him, dated 13th of September, 1842.

8. It was admitted that the parties suing as the heirs of R. D. Dawson, were his heirs, and their names were correctly set out.

9. It was further admitted, that the defendant was in possession of the land in controversy, at the commencement of this suit.

10. The monthly and yearly value of the premises was agreed upon between the parties.

The defendant, to show title in himself, relied upon the following facts:

1. An act of Congress, approved 6th March, 1820, the fourth paragraph of the sixth section of which provides as follows: " Four entire sections of land be, and the same are hereby granted to said State, (the State of Missouri,) for the purpose of fixing their seat of government thereon, which said sections shall, under the direction of the legislature of said State, be located, as near as may be, in one body at any time, in such townships and ranges as the legislature aforesaid may select, on any of the public lands of the United States, provided that

such locations shall be made prior to the public sale of the lands of the United States surrounding such location." 3 Stat. at Large, 547.

2. An ordinance, adopted by the Convention of the State of Missouri, on the 19th July, 1820, accepting the said grant of land. R. C. 1845, p. 22.

3. An act of the legislature of the State of Missouri, entitled " An act providing for the location of the permanent seat of government for the State of Missouri," approved 16th November, 1820. 1 Terr. Laws, 649. This act appoints commissioners to select a site for the permanent seat of government, and requires them to make their report to the next session of the General Assembly of said State.

4. An act, supplementary to the foregoing act, approved 28th June, 1821. 1 Terr. Laws, 773. This act provides for filling vacancies that may happen in the Board of Commissioners, and extends the time of making their report until the next session of the General Assembly.

5. A joint resolution of the General Assembly, approved 28th June, 1821, (1 Terr. Laws, 780,) requiring the Governor of the State to notify the Surveyor-General for the State of Illinois and Missouri, and also the Register of the Land-Office in which the lands are selected, that commissioners appointed for that purpose " have selected the fractional sections six, seven, and eight, the entire sections seventeen and eighteen, and so much of the north part of sections nineteen and twenty as will make four sections, in fractional township forty-four, south of the Missouri River, in range number eleven, to fifth principal meridian ; and that he request the said surveyor and register to withhold the same from sale or location, until the general assembly determine whether said selection be accepted by the State."

6. An act of the General Assembly, entitled " An act fixing the permanent seat of government," approved 31st December, 1821. 1 Terr. Laws, 825. The first section of which accepts the land above described for the use and benefit of said State. The second section provides for the laying out of a town thereon ; and the third section requires the Governor to notify the Surveyor-General of the acceptance of said land by the General Assembly, for the permanent seat of government, by transmitting to him an authenticated copy of said act.

7. Also, an act of the General Assembly, entitled " An act supplementary to the act fixing the permanent seat of government," approved 11th January, 1822. 1 Terr. Laws, 859. This act further provides for the laying out of a town on the land selected, authorizes the sale of the lots in said town, and prescribes the terms of said sale, and requires the commissioners to make a

report of their acts to the next General Assembly.   It further provides, that " any proposals made by any person or persons having claim to any part of the said lands selected for the permanent seat of government, in order that any claim or claims may be adjusted, *provided* nothing herein contained shall in anywise be construed to legalize or acknowledge such claim as valid in law," shall, by said commissioners, be communicated to the general assembly.

8. A proclamation by the President of the United States, dated 13th June, 1823, bringing into market by public sale, in the ordinary way, townships No. 40, 41, 42, 43, and 44, in range 11 west, and townships No. 40, 41, 42, and 43, in ranges 12, 13, and 14, of the fifth principal meridian.   Sales to take place on the first Monday of October, 1823.

9. It was admitted that the premises in dispute are a part of the lands described in the foregoing resolutions; and the acts of the legislature given in evidence by the defendant subsequent thereto; and that the defendant holds whatever title the State had to the said claim.

To rebut the defendant's title, the plaintiff gave the following evidence:

1. A copy of a letter from the Governor of the State of Missouri, addressed to the Surveyor-General of Illinois and Missouri, dated 3d July, 1821, informing him of the selection made by the commissioners, for locating the permanent seat of government, and requesting him to withhold the lands thus designated, from sale or location, until the General Assembly shall determine whether they will accept the same.   This letter is indorsed as having been received 8th July, 1821.

2. A letter from same to same, dated 1st January, 1822, transmitting an authenticated copy of the act of 31st December, 1821, entitled " An act fixing the permanent seat of government." This letter, by the indorsement thereon, appears to have been received on the day of its date.

3. A letter from the Surveyor-General to Governor McNair, in answer to the above letter, dated 2d January, 1822.   After acknowledging the receipt of the letter of the 1st January, 1822, and the copy of the act of the General Assembly of 31st December, 1821, the letter proceeds as follows: " I conceive it proper for me to inform you, for the information of the General Assembly, that a part of this land, (referring to the land selected by the commissioners, and accepted by the act of 31st December, 1821,) was located in virtue of a New Madrid certificate, on the 2d June, 1821, as represented on the sketch, and described in the entry made thereof, which you will find herewith inclosed.   You will also receive a copy of a paper purporting to be a copy of

an entry, or location of fractional section No. 7, township No. 44, north of the base line of range No. 11, west of the fifth principal meridian ; this day filed in this office by Major Taylor Berry. For the character of this last-mentioned paper, as I view it, see my remarks on the back thereof."

4. It was admitted that the journal of the Senate of Missouri, of the 23d November, 1821, shows that a committee of the senate, to which had been referred the report of the commissioners, for the location of the seat of government of the State, reported to the senate that the propositions made by Angers L. Langham ought to be accepted; and that the seat of government should be permanently located on the eight hundred and ninety-two acres of land situated at Cote Sans Dessein. That one half of which Langham proposed to donate to the State, which was concurred in. On motion, the report was laid on the table until next day, and afterwards, on the 25th November, 1821, the same was indefinitely postponed.

5. That the journal of the house of representatives shows that, on the 28th November, 1821, the house had under consideration the location of the permanent seat of government.

On the 15th of December next, following, the committee of the judiciary of the house reported to the house the state of the title at Cote Sans Dessein. On the 28th of same month, the house had the same subject under consideration.

6. It was further admitted that the journal of the house of representatives shows that, on the 3d January, 1822, Governor McNair laid before the General Assembly the communication received by him from the Surveyor-General, of date 2d January, 1822.

7. A joint resolution of the two houses of the General Assembly, requesting the Governor to notify the President of the United States of the selection made for the seat of government, approved 14th December, 1822   1 Terr. Laws, 984.

8. An act of the General Assembly of the State of Missouri, approved 19th December, 1822, (1 Terr. Laws, 1018,) authorizing the trustees appointed by the act to contract with the claimant for the removal of the New Madrid location from the lands selected for the seat of government on certain conditions ; if an adjustment be not obtained, then the trustees are required to select eight squares for public purposes, and the land so selected, together with the streets and alleys laid out, are condemned for public use, &c.

9. The survey of the lands selected by the State of Missouri, made in August, 1824, and approved by the Surveyor-General, on the 25th September, 1847.

Thereupon the defendant offered the following additional evidence, to wit:

1. A copy from the books of the Recorder of Land Titles of the relinquishment of lands in New Madrid, by which it appears that the land in lieu of which the certificate in favor of Baptiste Delisle was issued, and which the plaintiff had given in evidence, was made by Carter Beamon.

2. A copy of a deed from Delisle, for the land in New Madrid, to Carter Beamon, dated 4th August, 1817, acknowledged on same day, and recorded on the 17th September, 1817. It was certified by the Recorder of Land Titles as being a true copy of the original on file in his office, and was also a sworn copy. Having first proved by a witness that he had applied to said recorder for the original which he had seen in his office and had compared with the copy, stating to him that he wished to use it on the trial of this case. But the recorder refused to let it go out of his office, saying that it was one of the files of his office, and that he was not authorized to let it go out of his office.

3. A certified copy of a deed from Delisle to Alexander Conia, dated 17th October, 1810, proved on the 20th January, 1823, before the judge of the County Court of St. Louis County, and recorded on the 6th May, 1823, in Cole County. This deed conveys the same land in New Madrid County.

The plaintiffs objected to the introduction of both deeds as evidence in the cause, and their objections were sustained, and said deeds rejected.

4. The defendant then read in evidence the deposition of John Baptiste Delisle, which shows that, until the year 1842, he never knew that the certificate issued in his favor, by virtue of which the location on the land in question was made, had been issued, nor of the location, nor survey thereof, nor of the issuing or existence of a patent to him of said land, nor even that Congress had passed a law for the relief of the sufferers by earthquakes in New Madrid County. And that, consequently, until said last-mentioned date, he never had given any assent to any of the proceedings touching the New Madrid location in his name.

On the close of the evidence the counsel for the plaintiff prayed the court to declare the following, in the nature of instructions, to be the law of this case : —

1st. The patent from the United States to John Baptiste Delisle, if the same be true and genuine, is sufficient in law to vest the legal title [to] the land therein mentioned in the said Delisle, if he were living at its date. [Given.]

2d. The deed from Delisle and wife to Robert D. Dawson and Godfrey Lessieur, if true and genuine, is sufficient in law to vest said title in said Dawson and Lessieur. [Given.]

4th. That if the New Madrid certificate, granted to said Delisle, was, on the 2d June, 1821, located on the land in con-

6 *

troversy, and was afterwards surveyed by a United States sur-
veyor, according to law, and was appraised by the Surveyor-
General; and said land was finally patented to Delisle, according
to said location and survey, then the effect of said patent is to
vest said legal title in said Delisle, (as against any other title
derived from the United States,) from said 2d June, 1821, the
date of said location.   [Refused.]

5th.  That to vest the legal title to the four *entire* sections
of land granted to the State for a seat of government by the
act of the 6th March, 1820, it was necessary that said loca-
tion should have been made of four whole and entire sections;
and that a location thereof, on two whole sections and five parts
of other sections, was not in conformity with said act, and there-
fore void, unless subsequently ratified by the Government of the
United States, or some department or office thereof, authorized
so to do.   [Refused.]

6th.   That a location of said land by the State should have
been made in the office of some officer of the Land-Office
Department of the United States, and that a record of said
location should have been made in such office.   [Refused.]

7th.  To give validity to such location, it should have been
sanctioned by some officer of the United States having authority
in disposing of the public lands.   [Refused.]

8th.  That such location could not lawfully be made in the
office of the Surveyor of Public Lands in Illinois and Missouri.
[Refused.]

9th.  There is no evidence before the court, sitting as a jury,
that any location of said four entire sections ever was in fact
made.   [Refused.]

10th.  That if the New Madrid certificate, granted to John B.
Delisle, was, on the 2d of June, 1821, located on the lands in
controversy; and that said location was, on the 5th of August,
1821, surveyed by the proper officer of the United States, and
afterwards patented to said Delisle, in conformity to said survey,
the effect of said patent is to vest said title in said Delisle, or
his legal representatives, from the said 5th of August, 1821, as
against any person deriving title from the United States, after
said location, and before said patent.   [Refused.]

11th.  That the notice of location, survey, patent, and other
documents and acts shown in evidence by the plaintiffs, touch-
ing the location of the New Madrid certificate, No. 347, issued
to John B. Delisle, &c., if true and genuine documents, show a
better title than any which has been shown by the defendants.
[Refused.]

12th.  The neglect of the Surveyor-General, or the Recorder of
Land-Titles, to perform any act of mere duty on their part,

towards the consummation of a title on said location, could not affect the rights of the party interested. [Refused.]

The defendants then prayed the following instructions:

1st. The title of the United States to the land described in the copy of the patent given in evidence by the plaintiffs was not divested out of the United States until the plat and survey, given in evidence by the plaintiffs, was returned to the office of the Recorder of Land Titles; and the title of the United States to the land located under the directions of 'the Legislature of the State of Missouri, in pursuance of the 4th proposition of the 6th section of the act of Congress of the 6th of March, 1820, was vested in the State as early as the acceptance by said State of the selection of land made by her commissioners. If, therefore, said acceptance was made prior, in point of time, to the returning of said survey and plat to the office of the Recorder of Land Titles; and if the land so selected and located embraces the same land mentioned in said copy of patent given in evidence by the plaintiff, then the said plaintiffs are not entitled to recover in this action. [Refused.]

2d. If the John B. Delisle, who was the owner of the land in the county of New Madrid, in lieu of which the certificate No. 347 was issued, until the year 1842, knew nothing of the issuing or existence of said certificate, nor of the notice, survey, or patent, given in evidence by the plaintiffs, and never assented to the same prior to said date, and if, prior to said date, the former sections of land mentioned in the 4th proposition of the 6th section of 'the act of Congress, approved March the 6th, 1820, had been located under the direction of the Legislature of this State, upon the premises in question, then no title passed to said Delisle, in or to said premises, as against the State of Missouri. [Given.]

3d. If Langham and Hempstead obtained the certificate No. 347, given in evidence by the plaintiffs claiming to be the legal representatives of John B. Delisle, and in that character made the location, when in fact they were not the legal representatives of said Delisle, nor in any manner entitled to said certificate, nor to the land located by virtue thereof, such location is void, as against this defendant. [Refused.]

The first and third of which were refused, and the second given, to the giving of which the plaintiffs also excepted.

The court thereupon gave a verdict for the defendant.

The plaintiffs then moved for a new trial, which was refused, and a bill of exceptions was taken to the several rulings of the court.

It has been before mentioned, that the Supreme Court of Missouri affirmed the judgment of the court below by a divided

Lessieur et al. *v.* Price.

court; and that the plaintiffs sued out a writ of error, and brought the case up to this court.

It was argued by *Mr. Glover*, for the plaintiffs in error, and *Mr. Leslie*, for the defendant.

*Mr. Glover* made the following points:

1. The plaintiffs in error exhibited a title good in itself. The New Madrid certificate to John Baptiste Delisle, or his legal representatives, dated November 20, 1817, the entry therewith of June 2, 1821, the survey of August 5th, 1821, issued to the recorder February 11, 1822, patent certificate February 25, 1822, and patent in conformity with the said preliminary steps, dated November 13, 1822, constitute a title which would hold the land if no other title had emanated from the United States.

2. The defendant in error also claims that he holds a title valid in itself. This proposition the plaintiffs controvert entirely. They believe that the defendant has no title whatever; and in due time will endeavor to demonstrate that all the steps taken by the State of Missouri, in order to perfect a title under the grant contained in the act of Congress, approved March 6, 1820, were null and void, not being in conformity to the terms of the grant, or the laws of the land.

3. They will concede, however, for the present, and merely for the sake of the argument, that such a title exists in the defendant as he claimed for himself, and proceed to examine, with this view of the subject, what is the relative value of that title when compared with the plaintiffs'.

4. Whenever two titles have emanated from government, it becomes necessary to inquire which is the elder title, as that one must prevail. 1 Peters, 668; 13 Ib. 436.

5. The plaintiffs insist that their title began to exist at the date of the entry, or notice of location, June 2, 1821; and that the patent thereon, issued to Delisle, or his legal representatives, relates back to the said entry, and overreaches any other title, taking its inception in the mean time from the Government of the United States.

6. A contrary position has been taken just here by the defendant. It is this: that the right of Delisle, or any one claiming under him, incepted only at the moment of the return of the plat of his survey into the office of the Recorder of Land Titles. That in a case of conflicting titles, the priority of right can only be determined with reference to the date of this event; and that after the title is consummated by the emanation of a patent, it has relation only to this point of time. Two decisions of this

court are relied on as establishing this doctrine. Bagnell *v.* Broderick, 13 Peters, 436; and Barry *v.* Gamble, 3 How. 32.

(The counsel then examined these and other decisions of this court to show that the question did not arise, when an inchoate right springs up in the progress of acquiring a title under a New Madrid certificate, as against a conflicting grant.)

7. That the notice, survey, and patent vested a title in John Baptist Delisle, or his legal representatives, notwithstanding the said Delisle was ignorant of the fact of their emanation. The delivery of the said documents to Langham and Hempstead, as the acts of the United States, for the use of said Delisle, being beneficial to him, *his land in New Madrid having been destroyed,* vested a perfect title in him. 4 Kent, Com. 454 and notes; 2 Salk. R. 168; 1 Touch. 236; 15 Wend. 660; 6 Cow. 620; 8 Barn. & Cress. 448; 5 Mo. R. 147; 4 Day, 66; 12 Johns. 82.

8. But delivery is not a requisite formality to the validity of a patent. It takes effect on passing the seal of the office, without the act of delivery, and without any affirmative assent of the patentee. 2 Coke, 276 and note; 17 Cr. Eliz. 167; 5 Cow. 458; 1 Cranch, 160; 1 Cov. & Hughes, Dig. 738, ch. 7, No. 8.

9. It would, therefore, seem to be unnecessary to look further into the case, supposing that a valid title, standing by itself, has been shown in the State of Missouri. The inception of the same could not be earlier than the selection of the land in question, December 31, 1821, by the legislative act. The title of Delisle, beginning on the 2d June, 1821, was earlier in time, and must prevail over the supposed State title.

10. If, however, the right of Delisle did not begin to exist till there was proof of his affirmative assent to the entry, location and patent in his name, as shown by his deed to Lessieur and Dawson, in 1842, still the plaintiffs were entitled to recover, because there was no title whatever in the State, as will now be shown.

11. The act of Congress, March 6, 1820, gave the grant therein contained, on the express condition—"provided" is the word—that the location should be made prior to the public sale of lands surrounding such location. This word makes a precedent condition. This was an emergency the defendant saw the necessity of meeting. He, therefore, introduced proof that, on one side of the location the lands were not offered at public sale prior to October, 1823, while he introduced no evidence as to the public sale of the lands on the other side of the location, they having been offered to public sale prior to the location. The location was, therefore, in violation of this condition of the grant, and void. 4 Pick. 45, 7; Ib. 156; 6 T. R. 320; 2 Barr, 219.

12. The act of the Legislature of Missouri, approved Decem-

ber 31, 1821, was merely an expression of intention to locate, not a location of their grant. To have constituted a location, application ought to have been made at the proper land-office, and an entry allowed according to the laws of the United States. But there never was any communication made by any person for the State of Missouri to any officer of the United States, having power to grant an application for, or allow any location of, the said lands. [See Land Laws Instructions and op. part 2, No. 304, 474, 394, showing that such a location should be entered in the Register's office.] The State location was, therefore, void for want of a proper record thereof in the proper office of the government of the United States.

13. But the steps taken by the State of Missouri, with reference to their grant, were otherwise in violation of the terms of the grant, and contrary to the laws of the United States. In this, the lands claimed to have been located, are not the lands granted. In contemplation of the laws of the United States, the terms "section," "half section," "quarter section," designate certain specific tracts marked and designated on the map of public surveys, indicate not a quantity of acres, but tracts inclosed in certain metes and bounds, and no other idea can be substituted as the meaning of the grant. Thus a section is not 640 acres at the will of the grantee; but is a known and fixed subdivision of the public land, marked and bounded as such. And so with "a half section," "a quarter section." That this position is well taken, observe the distinctive phraseology of the following acts of Congress: An Act granting lands to Mississippi, Public Lands Laws, Instructions, and Opinions, part 1, p. 308. Ib. 267, an Act granting lands to Indiana. Ib. 312, an Act granting lands to Illinois. Ib. 305, an Act granting lands to Alabama. Ib. 578, an Act granting to Cherokee County, Alabama, 150 acres land in lieu of the "quarter section" allowed by law. Ib. 377, an Act granting lands to Florida. Ib. 315, an Act granting lands to Illinois. Ib. 484, an Act granting lands to Arkansas. Ib. 568, an Act granting lands to Arkansas, and confirming certain illegal selections made by Governor Pope, ib. p. 325.

The counsel then argued that the location by the State was irregular and void, for the following reasons :

1. Because "entire sections" were not taken throughout.

2. Because "fractions" were taken in part.

3. Because a slip, two miles in length, was taken off of two "entire sections," thus making them fractional, and breaking up the legal subdivisions.

4. By substituting *quantity* for *metes and bounds*, when by the laws of the land the metes and bounds of four entire "*sections*" were all the State was entitled to receive, whether they contained

2,566 acres or not. If this grant had been of "*sections*" the purpose would be manifest; but a grant of "*four entire sections*" was enough to preclude the possibility of doubt as to the legislative intention. See 3 Howard, 660, where a survey made in violation of a rule laid down for securing the proper subdivision of the public lands was pronounced void, as was also the *patent on said survey.* See 7 Porter, R. 432; 6 Cowen, 722.

14. Should the defendant, however, succeed in establishing the legality and necessity of a survey of the grant to the State, he will still not be relieved of difficulty. The doctrine for which he has contended — of appropriation of the land by survey — will then be brought home to his own door. His survey not being made till August, 1824, could not appropriate the land prior to that time; and, not being approved till 1847, had no existence as an official act till after the institution of his suit. The approval of said survey was the first entry on the books of any officer of the land department, in relation to the State grant or selections. The defendant has assumed the ground that the State grant was to be located by a new survey, in like manner as a new Madrid certificate; and that the plat of the survey was the location. If he is right in this position, then two conclusions follow. 1. That the State location was not made till after the public sale of all the lands surrounding it had taken place, and was, of course, void by the terms of the grant. 2. That when it was located, the land had been appropriated to Delisle, and the location void for want of title in the United States.

15. If it shall be considered by the court that, although the lands of Delisle, in lieu of which his New Madrid certificate was issued, were destroyed, and the grant was consequently pure donation to him, that, nevertheless, no title vested in him till his deed to Dawson and Lessieur, in 1824, still the plaintiffs were entitled to recover, the defendant not having shown any title in himself. A title springing up in Delisle in 1842, was in time to appropriate the land.

16. The act of the Legislature of Missouri, approved December 19, 1822, [1 Terr. Laws, p. 1018,] by which the tract patented to Delisle was condemned to the public use, was not relied on heretofore by the defendant as helping his case, and, I suppose, will not be here.

*Mr. Leslie,* for the defendant in error, contended that, under the several acts, viz., of Congress, approved 6th March, 1820; an ordinance of the Convention of Missouri, passed on 19th of July, 1820, accepting the grant; an act of the General Assembly of Missouri, approved November 16, 1820; an act of the General Assembly of Missouri, approved June 28, 1821; nothing more

was necessary than the mere passage of the acts to vest a title in the State of Missouri.

The counsel then contended that Hempstead and Langham, in their proceedings in making the location and obtaining the certificate, were guilty of fraud on Delisle and on the government. On Delisle, because he was alive and had no knowledge of their doings and gave no assent thereto; on the government, because they sought to appropriate the public lands contrary to the terms and meaning of the act of Congress for the benefit of New Madrid sufferers.

The counsel then contended that the court erred in refusing the first instruction asked by the defendant's counsel; that the point contained therein was directly involved in the cases of Basnell et al. *v.* Broderick, 13 Pet. 436; and Barry *v.* Gamble, 3 How. 51, and was decided by this court.

The counsel then contended that the court was correct in granting the second instruction asked for by the defendant's counsel; that the act of Congress for the relief of the New Madrid sufferers was not a mere donation of land, to which the assent of Delisle might be implied; but that it was an exchange which could not be effectual until Delisle surrendered his injured tract to the United States. Consequently an affirmative act on his part was necessary before a title to the new location could vest; and, therefore, no title vested in him until 1842, when he assented to what had been done in his name. But before 1842, the title of the State of Missouri had become complete.

Mr. Justice CATRON delivered the opinion of the court.

The first consideration arising in this case involves a matter of practice. The suit was brought in a State Circuit Court of Missouri, and tried by the court without the intervention of a jury; when the judge ruled questions of law propounded to him unfavorable to the plaintiffs, and gave judgment for the defendant, to reverse which, a writ of error was prosecuted, and the cause removed to the Supreme Court of that State. On a rehearing there, only two of the judges were competent to preside; they disagreed in opinion, and a judgment of affirmance was entered because of that division. And the question here is, how we are to treat the points ruled in the Circuit Court.

Our conclusion is, that the rulings of the circuit judge were adopted and affirmed by the judgment rendered in the Supreme Court, in like manner that they would have been had both judges concurred in affirming the judgment on all the grounds assumed by the court below: to hold otherwise, would be declaring that nothing had been decided in the State court of last resort, and thereby a second writ of error to this court would be defeated.

Lessieur et al. *v.* Price.

Both sides claim title under acts of Congress; on a construction of these, and the facts calling for construction, the controversy throughout depends, and therefore, this court has unrestricted power to adjudge and conclude the controversy.

Plaintiffs claim title under a New Madrid certificate; and the defendant under an act of Congress, granting to the State of Missouri a tract of four sections, to the end of locating the seat of government on it; and the principal question presented by the record is, which party first acquired such an interest in the land as will, by the laws of Missouri, support an action of ejectment. The State law provides, that those claiming lands by "New Madrid locations," may maintain actions of ejectment therefor. The location must, of course, be an appropriation of the land, and its acquisition by the locator, with the corresponding right to possess and enjoy it, as against the United States; and the inquiry arises, what acts were required on the part of the locator to divest the United States of title? This depends on a true construction of the act of February 17, 1815, for the relief of the inhabitants of New Madrid county, who suffered by earthquakes. John Baptiste Delisle was one of the sufferers, and on November 20th, 1817, a location certificate for two hundred arpens was obtained from the Recorder of Land-Titles, authorizing Delisle to locate that quantity on any of the public lands within Missouri Territory, the sale of which was authorized by law.

The act declares, that such certificate having issued, the location shall be made on application of the claimant by the principal deputy-surveyor for said Territory, or under his direction, whose duty it shall be to cause a survey thereof to be made, and return a plat of the survey to the Recorder of Land-Titles, together with a notice in writing, designating the tract or tracts thus located, and the name of the claimant on whose behalf the same shall be made, which notice and plat, said recorder shall cause to be recorded in his office. That it shall be the duty of the recorder to transmit a report of claims allowed, and locations made, under this act, to the Commissioner of the General Land-Office; and he shall deliver to the party a certificate, stating the circumstances of the case, and that he is entitled to a patent, and on which a patent shall issue, &c.

The surveyor was required to make the location, and survey, "on application of the claimant." On this requirement a practice naturally sprung up, of filing with the surveyor a notice of location, describing the land that the claimant desired should be surveyed for him, and with which request the surveyor complied, unless some valid objection stood in the way, and rendered a compliance improper.

The notice of location, in this instance, was delivered to the Surveyor-General June 2d, 1821, for the land in dispute, and is claimed as the inception of title and location in fact, within the meaning of the State law, authorizing ejectments on New Madrid locations. That it was the mere act of the party, not having the assent of government, must be admitted. The act of Congress provides, " that, in every case where such location shall be made, according to the provisions of this act, the title of the person or persons to the land injured as aforesaid shall revert to, and become absolutely vested in the United States. A concurrent vestiture of title must have occurred. The injured land must have vested in the United States at the same time that title was taken by the new location. It was intended to be an exchange between the parties, and the inquiry arises, When did the United States take title ? Was it when application in writing was made by the claimant to the surveyor to have his land located and surveyed at a particular place? The warrant, or location certificate, issued from the Recorder's office, and there it was returnable ; there the plat and certificate were returned and recorded ; that officer issued the patent certificate ; in that office the law required all official business to be transacted, and not in the Surveyor's office. That the notice of location, and plat, and certificate were recorded in the Surveyor's office is true, and it was proper. It was not done, however, to the end of furnishing evidence of title to the claimant, but to have evidence there to show that the land was appropriated according to the New Madrid act, and for the convenience of the Surveyor's department. The plain meaning of the law is as above stated, nor can its import be changed by the practice pursued in the Surveyor's office ; there the claimant could not go for record evidence of his location, binding the United States to an exchange of lands. He could only refer to the Recorder's office. And what was the character of the evidence he had to rely on there? His entry was to be made by the principal Surveyor, or under his direction. It was to consist of a plat of survey, and a certificate describing the land, with the name of the claimant for whom the location by survey was made. This return the Recorder had to examine, pass upon, and record ; if the location and survey had been properly made, then the United States assented to the exchange, and not until then.

The danger of allowing a claimant to locate a floating warrant at his own discretion, threatened the country with evils that had afflicted some of the elder States. It would have been certain to produce conflict of claims for the same land, to a material extent, and been contrary to a settled policy of the United States in disposing of the public lands, which was to avoid such con-

flict; and, therefore, the act of 1815 vested the power of locating the claim in the principal Surveyor of the Territory.

We expressed our opinion as to what was a location of a New Madrid claim in the case of Bagnell *v.* Broderick, (13 Peters,) thirteen years ago; and did so again in Barry *v.* Gamble, (3 How. 51,) in 1845, nor would we have said any thing further on the subject but for the division of opinion in the Supreme Court of Missouri, which seems to call in question the opinion expressed in the cases referred to, as we understand the proceeding there, on the ground that such expression of opinion was not necessary to arrive at the decisions then made.

A second question on the merits arises on the defendant's title, and is so connected with the one just discussed, that the principles governing it must be settled before a legal conclusion can be arrived at which will govern the controversy.

On the 6th of March, 1820, Congress provided by law for the admission of the then Missouri Territory as a State of the Union, and among numerous other regulations to aid the new State on coming in, it was enacted, " that four entire sections of land be, and the same are hereby granted to the said State, for the purpose of fixing the seat of government thereon ; which said sections shall, under the direction of the Legislature of said State, be located, as near as may be, in one body, at any time, in such townships and ranges as the legislature aforesaid may select, on any of the public lands of the United States : Provided, that such locations shall be made prior to the public sale of the lands of the United States surrounding such location."

To secure the benefits of this donation the following steps were taken by the State of Missouri :

1. An ordinance adopted by the convention convened to form a constitution on the 19th of July, accepting the grant of land.

2. An act of the Legislature of the State providing for the location of the permanent seat of government, approved 16th November, 1820. This act appoints commissioners to settle a site for the permanent seat of government, and requires them to make their report at the next session of the General Assembly of said State.

3. An act supplementary to the foregoing act, approved 28th June, 1821. This act further extends the time of making their report until the next session.

4. A joint resolution, also approved 28th June, 1821, requiring the Governor of the State to notify the Surveyor-General for the States of Illinois and Missouri, and also the Register of the Land Office in which the lands are selected, that the commissioners appointed for that purpose " have selected the fractional sections six, seven, and eight, the entire sections seventeen and eighteen,

and so much of the north part of sections nineteen and twenty as will make four sections in fractional township forty-four south of the Missouri River, in range No. 11 west, fifth principal meridian ; and that he request the said Surveyor and Register to withhold the same from sale or location, until the General Assembly determine whether said selection be accepted by said State."

5. An act of the General Assembly, entitled " An act fixing the permanent seat of government," approved 31st December, 1821, the first section of which accepts the land above described for the use and benefit of said State. The second section provides for the laying out of a town thereon, and the third section requires the Governor to notify the Surveyor-General of the acceptance of said land by the General Assembly, for the permanent seat of government, by transmitting to him an authenticated copy of said act.

6. Also an act of the General Assembly, entitled "An act supplementary to the act fixing the permanent seat of government," approved 11th January, 1822. This act provides for the laying out of a town on the land selected, authorizes the sale of the lots in said town, and prescribes the terms of said sale, and requires the commissioners to make a report of their acts in this respect to the next General Assembly. It further provides that " any proposals made by any person or persons having claim to any part of the said land, selected for the permanent seat of government, in order that any claim or claims may be adjusted, shall by said commissioners be communicated to the General Assembly."

These proceedings took place before the surrounding lands were offered at public sale.

First, it is insisted " that the location was void because there never was any communication made by any person for the State of Missouri to any officer of the United States having power to grant an application for, or allow any location of, said lands; and that such location should have been entered and recorded in the Register's office of the local land district."

The land was granted, by the act of 1820 ; it was a *present grant*, wanting identity to make it perfect; and the legislature was vested with full power to select, and locate the land ; and we need only here say, what was substantially said, by this court, in the case of Rutherford *v.* Green's heirs, (2 Wheat. 196,) that the act of 1820 vested a title in the State of Missouri, of four sections ; and that the selection made by the State Legislature pursuant to the act of Congress, and the notice given of such location to the Surveyor-General, and the Register of the local district where the land lay, gave precision to the title, and

attached to it the land selected. The United States assented to this mode of proceeding; nor can an individual call it in question.

It is insisted, in the next place, that the location was void, because fractional sections were selected, to make the quantity of 2560 acres, embraced by the grant; that the law granted entire sections, in a square form, and intended to exclude fractional parts of sections; and as this controversy involved a fraction, no title was taken by the State of Missouri.

This objection is plausible, but we think unsound. The whole quantity was to be selected in one body as near as might be; the object of the grant was a city site for a great political purpose; that the seat of government would be established on the Missouri River was almost certain, a fact that could not have been overlooked by Congress. To a metropolis, the river front was absolutely necessary. If the land was selected adjoining the river, fractions must of necessity be taken; and, therefore, the act of Congress cannot be construed in the restricted sense contended for without violating a leading object of grantor and grantee; nor does it seem to have entered the mind of either, that a selection of fractions violated the terms of the grant. From first to last, for nearly thirty years, has the grantor acquiesced; nor do we think that the validity of the selection can be called in question by an objection never set up by the United States.

The next inquiry is, as to the date when the land selected attached to the grant. June 28, 1821, the Governor of Missouri notified the Surveyor-General of the fact, that the land had been located by the commissioners, and awaited the action of the Legislature; and on the 31st day of December, 1821, the land was accepted by the Legislature; the same act provides for laying off a town and the establishment of the seat of government thereon. And as the commissioners had power to locate, and did so, subject only to legislative sanction of their report, and that report was sanctioned, our opinion is that the acts were concurrent, and that the title refers to the first act; and, therefore, that the State took title from the 28th of June, 1821, when the Surveyor-General was notified that the location had been made. We state this as matter of principle, held in the case of Landes *v.* Brant, decided at last term. It is not material, however, whether the date be the 28th of June, or 31st of December, 1821, when the Legislature acted. Delisle's location by survey, was filed and recorded, in the Recorder's office, February 11, 1822; this is the first evidence of its legal existence appearing of record, and on that day it took date. It follows, that the legal title of Missouri, is elder than the equitable title set up under Delisle's claim. This was in effect the opinion of the court below, as appears by a refusal to give the 4th, 5th, 6th, 7th, 8th,

7 *

9th, 10th, 11th, and 12th exposition of the law demanded by the plaintiffs; and with which opinion we concur.

The next question raised and decided by the State courts appears by the following exposition of the law, pronounced at the request of the defendant, and on which the judgment also proceeded:

"If John B. Delisle, who was the owner of the land in the County of New Madrid, in lieu of which the certificate No. 347 was issued, until the year 1842, knew nothing of the issuing or existence of said certificate, nor of notice, survey, or patent given in evidence by the plaintiffs, *and never assented to the same prior to that date;* and if, prior to that date, the four sections of land mentioned in the fourth proposition of the sixth section of the act of Congress, approved March 6th, 1820, had been located under the direction of the Legislature of this State upon the premises in question, then no title passed to the said Delisle, in or to said premises, as against the State of Missouri."

The evidence shows, that all the steps taken for the purpose of obtaining a grant of land from the United States, in lieu of land owned by John B. Delisle, lying in New Madrid County, and which had been injured by earthquakes, were taken by Langham and Hempstead, or at their instance, they representing themselves to be the legal representatives of Delisle, and without the consent, knowledge, or authority of Delisle, and that what was done by them in his name did not receive his sanction or assent until the year 1842. But it is insisted that the law will imply his assent, as the grant was beneficial to him. This might be a safe implication if the grant had been a pure donation unaccompanied with any condition; but such is not the fact. The act of Congress for the relief of the inhabitants of New Madrid County, whose lands had been materially injured by earthquakes, provides that, where locations are made under the act, the title of the individual to the land injured shall revert to, and become absolutely vested in, the United States. Instead, therefore, of its being a pure donation on the part of the government, it was a proffered barter or exchange of lands by legislative enactment. Where the value of the land in New Madrid had been entirely destroyed, it might be regarded as a donation of other land to the individual owner; but where that was not the case, it could not be so considered. Now, it is a well known fact, that much of the land exchanged with the government under this law is this day of more intrinsic value than the land located in lieu thereof. Where this is the case, the government, instead of making a donation, has driven a profitable bargain. But the government is not chargeable with any

wrong in this transaction, because the owners of land in New Madrid were not compelled to accept the provisions of the act; if they did so, it was a voluntary act on their part, and their assent should be evidenced by some affirmative act done by them.

There is, however, in this case, no ground for implication. All presumption of assent is utterly excluded by the evidence of Delisle himself, who states that he was wholly ignorant of the existence of the act of Congress on that subject until the year 1842. He could not be divested of his land in New Madrid until he assented to the exchange, and he could give no assent until he was informed of the act of Congress making provision for those whose land had been injured. The title, then, to the land in New Madrid remained in Delisle up to the year 1842, when he assented to what had been done by Langham and Hempstead in his name; and, as Congress only intended to grant other land on condition that the title to the land injured should revert to, and vest in the government, no title could pass to Delisle until 1842, prior to which time the State of Missouri had acquired title to the land in controversy.

It is proper to remark that, on the last ground of defence, we have adopted the views, in part, expressed by one of the judges of the Supreme Court of Missouri, whose opinion is found in the record.

Our conclusion is that, on both grounds of defence, the State courts expounded the law applicable to the facts correctly, and that therefore the judgment should be affirmed.

## Order.

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Missouri, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Court in this cause be, and the same is, hereby affirmed, with costs.