UNITED STATES v. NORTHERN PAC. RY. CO. et al.

(Circuit Court, D. Montana. August 28, 1911.)

No. 979.

1. PUBLIC LANDS (§ 81*)—VALIDITY OF PATENTS—CONSTRUCTION OF STATUTE—CURATIVE EFFECT.

By Act May 1, 1888, c. 213, § 3, 25 Stat. 133, ratifying a treaty with the Gros Ventre and other tribes of Indians in Montana, it was provided that the lands ceded thereby should be a part of the public domain and open to entry under certain of the land laws specified, but not under any other laws. By Act March 3, 1911, c. 218, 36 Stat. 1080, such section was amended so as to provide that the lands should be opened to the operation of all the laws regulating the entry, sale, or disposal of public lands, and that "no patent shall be denied to entries heretofore made in good faith under any of the laws regulating the entry, sale or disposal of public lands if said entries are in other respects regular, and the laws relating thereto have been complied with." *Held,* that patents to lands so ceded, selected as lieu lands under a railroad grant prior to the amendment, which selections were approved, were validated by such amendment.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 250-282; Dec. Dig. § 81.*]

2. PUBLIC LANDS (§ 81*)—CONSTRUCTION OF STATUTES—"ENTRY" DEFINED.

The word "entry," as used in the public land laws, covers all methods by which a right to acquire title to public lands may be initiated, and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

includes within its meaning the filing of selections of lieu lands under a railroad grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 250–252; Dec. Dig. § 81.*

For other definitions, see Words and Phrases, vol. 3, p. 2417.]

In Equity. Suit by the United States against the Northern Pacific Railway Company and others. Decree for defendants.

Geo. W. Wickersham, Atty. Gen., and J. W. Freeman, U. S. Dist. Atty., of Helena, Mont.

C. W. Bunn and Chas. Donnelly, both of St. Paul, Minn., Wm. Wallace, Jr., and J. G. Brown, both of Helena, Mont., and R. F. Gaines, of Missoula, Mont., for defendants.

RASCH, District Judge. [1.] Whether the lands involved in this suit were, prior to the act of May 1, 1888, c. 213, 25 Stat. 133, a part of the Gros Ventres, Piegan, Blood, Blackfeet, and River Crow Indian reservation, and, prior to the amendatory act of March 3, 1911, subject to entry and disposal only under the particular land laws mentioned in section 3 of the original act, which is one of the disputed questions presented, need not be determined, as, in my opinion, the approved selections of the lands in controversy and the patents issued therefor, now sought to be annulled, were, if defective at all, validated by the amendatory legislation of March 3, 1911. Under the law as originally enacted, the ceded portions of the reservation were made "a part of the public domain" and opened to the operation of the laws regulating homestead entry, except section 2301 of the Revised Statutes (U. S. Comp. St. 1901, p. 1406), and to entry under the town-site laws, and the laws governing the disposal of coal lands, desert lands, and mineral lands," but not "to entry under any other laws regulating the sale or disposal of the public domain." By the amendment they are opened to the operation of all of the laws regulating the entry, sale, or disposal of the public domain, and "no patent shall be denied to entries heretofore made in good faith under any of the laws regulating the entry, sale, or disposal of public lands, if said entries are in other respects regular and the laws relating thereto have been complied with." That the patents could not be successfully assailed if the selections had been made under the law as amended, and that no valid objections to the making and filing of such selections of the same lands and to their approval could now be urged if made and filed under the law as it now stands, is conceded. So that, if it were to be held that the amendment did not cure the alleged defects of defendant's title to the lands in question, the effect of such holding would simply be to require the defendant railway company to do over again what it did once before; that is, again file in the local land office its selection of the lands which were patented to it upon the selections made in 1908. A construction which would deny to the amended statute any curative effect as regards selections made and approved prior to its enactment, when, at the same time, the right to acquire the lands thereafter by

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the very means of such identical selection is unmistakably conferred, thus imposing a burden which it does not seem reasonable to assume as having been intended by the lawmaking body, should obviously not be adopted, unless the words of the statute clearly demand it.

[2] They do not demand it. The doubt as to the operative effect of the amended statute, which has been suggested, arises from the use of the word "entries," with reference to which it is surmised, rather than asserted, that the selection of lieu lands to supply losses under the original grant does not constitute "entries," within the meaning of that term as used in the statute. It is said that "in the nomenclature of the public land laws a railway selection is not an "entry." It is usually termed a "filing," and public land legislation intended to validate selections or filings has usually designated them as such." But this is clearly not decisive; nor does the mere fact, if it be a fact, that a practice of that kind has been generally followed, in the matter of land legislation furnish a proper or adequate test, by means of which the meaning of words used in the statutes relating to the public lands may in all cases be ascertained and determined. The established rule undoubtedly is that it must be assumed that, where the meaning of particular words, terms, or phrases has been judicially defined by the court, or by the departments of the government, the sense in which such word, term, or phrase was used in legislation was with the meaning which the courts and the departments had theretofore attached to the same.

Thus, as to the meaning of the word "entry," the Supreme Court of Kansas, in the case of Goddard v. Storch, 57 Kan. on page 717, 48 Pac. on page 16, said:

"The word is of generic signification, and includes all methods of the acquisition of the equitable title of public lands, prior to the passing of the legal title by the government patent, except under laws in which words of special signification, such as 'pre-empted,' are used. Our attention has not been called to a single case in which such a limited and special meaning as the plaintiff in error attaches to the word has been given. On the contrary, the officers of the United States Land Department allow it a much more extended meaning than we have done. 'An entry is that act by which an individual acquires an inceptive right to a portion of the unappropriated soil of the country by filing his claim thereto with the proper land officer of the United States.' Secretary Chandler to Commissioner Williamson, Thomas v. Railroad Co., 2 Copps' Pub. Land Laws 1882, p. 869. 'You hold that the word "entry" means a purchase with money, or a location under or by virtue of some kind of warrant or scrip. It undoubtedly has the meaning you give it; but I think, as used in said act, it should have a more general meaning, and be construed so as to include any and every lawful appropriation of lands. Lands certified to railroads in accordance with the terms of the grant are thus appropriated.' Acting Secretary Gorham to Commissioner Williamson, State of Iowa v. Cedar Rapids & M. R. R. Co., 2 Copps' Pub. Land Laws 1882, p. 961."

And in Denny v. Dodson (C. C.) 32 Fed. on page 910, Judge Field defined it as follows:

"The term 'entry' covers a homestead and town-site entry as well as a private entry made by a settler after the close of the public sales. It is used to designate *the initiatory proceeding for the acquisition* of a portion of the lands of the United States which are open to private sale; or, as said in Chotard v. Pope, 12 Wheat. 588, 6 L. Ed. 737, 'it means that act by which

an individual acquires *an inceptive right* to a portion of the unappropriated soil of the country by *filing his claim* in the appropriate local land office.'"

The steps required to be taken for the acquisition of lands under the provisions of the New Madrid Act, approved February 17, 1815, c. 45, 3 Stat. 211, which entitled a person whose land had been injured by the earthquakes of December, 1811, "to locate the same quantity on any of the public lands in the Missouri territory, but not exceeding in any case 640 acres, on which being done the title to the lands injured should revert to the United States," were in a general way quite similar to those required in making selections for losses sustained under railroad grants. "The recorder of the land titles for the territory of Missouri was made the judge to ascertain who was entitled to the benefit of the act, and to what extent," and if the claim of right to make such selections was well founded "he was directed to issue a certificate to the claimant." Certificates having issued, "and a notice of location having been filed in the surveyor general's office, on application of the claimant the surveyor was directed to *survey the land selected,* make return to the recorder of land titles," and "the patent issued on the plat and certificate of the surveyor, returned to the recorder's office, and which was by him reported to the General Land Office." Bagnell v. Broderick, 13 Pet. 447, 10 L. Ed. 235. In speaking of the nature and requirements of the act and the effect of proceedings taken thereunder, the court, in Lessieur v. Prive, 12 How. on page 74, 13 L. Ed. 893, said:

"The act of Congress provides 'that in every case where such location shall be made, according to the provisions of this act, the title of the person or persons to the land injured, as aforesaid, shall revert to and become absolutely vested in the United States.' A concurrent vestiture of title must have occurred. The injured land must have vested in the United States at the same time that title was taken by the new location. * * * His *entry* was to be made by the principal surveyor, or under his direction. *It was to consist* of a plat of survey, and a certificate describing the lands, with the name of the claimant for whom the location by survey was made. This return the recorder had to examine, pass upon, and record; if the location and survey had been properly made, then the United States assented to the exchange, and not until then."

Now, if locations or selections (these terms are used interchangeably in Bagnell v. Broderick, supra), under the New Madrid Act, conditioned for their validity upon the approval of the recorder, were "entries," then, clearly, the selections of lieu lands made and filed by the defendant railway company, comprising the lands in controversy here, were likewise entries, and come within the meaning of the word as used in the amended statute of March 3, 1911. Chotard v. Pope, 12 Wheat. 588, 6 L. Ed. 737; Sturr v. Beck, 133 U. S. 541, 10 Sup. Ct. 350, 33 L. Ed. 761; McGuire v. Brown, 106 Cal. 660, 39 Pac. 1060, 30 L. R. A. 384.

Decree of dismissal may be entered.