## HARTMAN v. GREENHOW.

1. The judgment in a proceeding for a *mandamus* is subject to review on the same conditions as that in any other action.

2. A final judgment or decree in any suit in the highest court of a State in which a decision in the suit could be had, may, in the class of cases provided for in sect. 709, Rev. Stat, be re-examined here upon writ of error, although it was rendered upon an equal division of opinion among the judges. It is immaterial whether that court, in rendering it, was exercising original or appellate jurisdiction.

3. In the adjustment of her debt by the State of Virginia, her bonds, payable to order or bearer, with coupons annexed to them payable to bearer, were issued under the act of March 30, 1871, known as the "Funding Act," which declares that the coupons "shall be receivable at and after maturity for all taxes, debts, dues, and demands due the State," and that this shall be expressed on their face. Where, therefore, a creditor took, as in that act provided, such bonds for two-thirds of the amount of the old bonds he surrendered, and a certificate for the balance, a contract was consummated between the State and the holder of the bonds and the holder of the coupons, from which, without their consent, she could not be released.

4. A subsequent enactment requiring the tax on the bonds issued under that act to be deducted from the coupons originally attached to them, when tendered in payment of taxes or other dues to the State, cannot be applied to coupons separated from the bonds, and held by a different owner, without impairing the contract. Such an owner is therefore entitled to a *mandamus* to compel the proper officer to receive for their full amount the coupons so tendered.

ERROR to the Supreme Court of Appeals of the State of Virginia.

The case is fully stated in the opinion of the court.

*William L. Royall* for the plaintiff in error.

*Mr. James G. Field*, Attorney-General of Virginia, *contra*.

MR. JUSTICE FIELD delivered the opinion of the court.

The plaintiff in error, who is the petitioner in the court below, is a citizen and resident of the city of Richmond, State of Virginia; and on the 5th of April, 1878, was indebted to the State for taxes to the amount of twenty-six dollars and fifty-three cents. On that day he tendered to the treasurer of Richmond — who is by law charged with the duty of collecting the taxes of the State in that city — certain interest coupons, which were overdue, amounting to twenty-four dollars, cut from bonds of the State, issued under the provisions of an act of the General Assembly, passed March 30, 1871, commonly known as the Funding Act, and two dollars and fifty-three cents in lawful money of the United States, in payment of the taxes; but the treasurer refused to receive the coupons in discharge of the taxes without first deducting therefrom the taxes upon the bonds to which they were originally attached. The petitioner holding the coupons was not at the time the owner of such bonds. Upon this refusal he applied to the Supreme Court of Appeals of Virginia for a writ of *mandamus* to the treasurer to compel him to receive the coupons, with the money mentioned, in full discharge of the petitioner's taxes, without any deduction from the coupons for the taxes upon the bonds.

The court issued a rule or an alternative writ upon the treasurer, to which he answered, that the General Assembly of the State had, for many years, exercised the right to tax all bonds, choses in action, and other evidences of debt, including bonds of the State; that the taxes assessed upon the latter bonds were according to their market value, the amount being fixed at fifty cents on the one hundred dollars of such value; that the law required the taxes to be collected when the interest on the bonds was paid, and made it a high penal offence for any officer to receive coupons in payment of taxes without deducting

from their face value the tax levied upon the bonds from which they were taken; and he referred to several acts of the legislature in support of this statement. He also answered, that at the time the coupons were tendered to him he proposed to deduct from them the amount of the taxes on the bonds to which they were originally attached, and demanded of the petitioner a like amount in money in addition to what was tendered; that he would not otherwise have been justified in giving a receipt in full for the taxes due; and that this additional amount the petitioner refused to pay. The respondent, therefore, denied that the petitioner was entitled to the writ, and prayed that his petition be dismissed.

The application was fully argued before the Supreme Court of Appeals by counsel for the petitioner, and by the attorney-general of the State for the treasurer. The judges of the court were equally divided in opinion upon it, and, as is usual in such cases, the application was denied, and judgment to that effect, with costs, was entered. To review this judgment the case is brought here on writ of error.

The principal question for determination, as thus seen, is the validity of the statute of the State requiring the tax levied upon its bonds to be deducted from the coupons for interest, originally attached to them, when the coupons are presented for payment, so far as it applies to coupons separated from the bonds and held by different owners.

To fully understand this question, it will be necessary to make a brief reference to the legislation of the State upon her indebtedness. But before doing this there is a question of jurisdiction to be considered. The judgment of the Supreme Court of Appeals being entered upon an equal division of opinion among its judges, it is argued that there is no such final adjudication of the State court as can be reviewed by this court.

The Revised Statutes, which express the statute law of the United States in force Dec. 1, 1873, provide, in sect. 709, — embodying substantially the provisions of the twenty-fifth section of the Judiciary Act of 1789, — that a final judgment or decree, in any suit, of the highest court of a State in which a decision could be had, may be re-examined by the Supreme Court of

the United States in three classes of cases. In all of them there must be a final judgment or decree of the highest court of the State, and the decision expressed by that judgment must have involved a question under the Constitution, laws, or treaties of the United States, and have been adverse to some right, privilege, or immunity claimed under them. Here the Supreme Court of Appeals certifies that on the hearing of the case there was drawn in question the validity of the statute of the State authorizing the tax upon the bonds and requiring its deduction from the coupons, on the ground of its repugnancy to the provision of the Constitution of the United States, prohibiting any legislation by the States impairing the obligation of contracts; and that the decision was in favor of the validity of the State statute and against the right claimed by the petitioner under the provision of the Constitution of the United States. That this certificate correctly states the question involved will more clearly appear from the legislation of the State, which we shall presently consider. The judgment denying the writ of *mandamus* was a final determination against the claim of the petitioner to have the coupons held by him received for taxes without a deduction from their face value of the amount of the tax levied on the bonds. A *mandamus* in cases of this kind is no longer regarded in this country as a mere prerogative writ. It is nothing more than an ordinary proceeding or action in which the performance of a specific duty, by which the rights of the petitioner are affected, is sought to be enforced. Says Mr. Chief Justice Taney: "It undoubtedly came into use by virtue of prerogative power in the English crown, and was subject to regulations and rules which have long since been disused; but the right to the writ and the power to issue it have ceased to depend upon any prerogative power, and it is now regarded as an ordinary process in cases to which it is applicable. It was so held by this court in the cases of *Kendall* v. *The United States*, 12 Pet. 615, and *Kendall* v. *Stokes et al.*, 3 How. 100." *Kentucky* v. *Dennison*, 24 How. 66, 97. And such we understand to be the law of Virginia. The judgment, therefore, in the case, stands like the judgment in an ordinary action at law, subject to review under similar conditions. It is not the less expressive of the decision of the

court upon the merits of the petitioner's claim in the case because it is rendered upon an equal division of opinion among the judges. The fact of division does not impair the conclusive force of the judgment, though it may prevent the decision from being authority in other cases upon the question involved. The judgment is that of the entire court, and is as binding in every respect as if rendered upon the concurrence of all the judges. *Lessieur* v. *Price*, 12 How. 59; *Durant* v. *Essex County*, 7 Wall. 107; s. c. 101 U. S. 555.

Nor does it matter that the judgment was rendered in an original proceeding in the Supreme Court of Appeals of Virginia, and not in a case pending before that court on appeal. It is enough for our jurisdiction that the judgment is by the highest tribunal of the State in which a decision could be had in the suit. When such a judgment is brought before us for review, involving in its rendition a decision upon a Federal question, we do not look beyond the action of that court. It is enough that we have its final judgment in the case, whether it be one of original jurisdiction or heard by it in the exercise of its own appellate power over the inferior courts of the State.

We proceed, therefore, to consider the legislation of the State upon her indebtedness. A brief sketch of it will perhaps enable us better than in any other way to exhibit the question for our determination, and indicate the solution it should receive.

It appears from the statutes to which we are referred — and we know the fact as a matter of public history — that prior to the late civil war Virginia had become largely indebted for moneys borrowed to construct public works in the State. The moneys were obtained upon her bonds, which were issued to an amount exceeding $30,000,000. Being the obligations of a State of large wealth, which never allowed its fidelity to its promises to be questioned anywhere, the bonds found a ready sale in the markets of the country. Until the civil war, the interest on them was regularly and promptly paid. Afterwards the payments ceased, and until 1871, with the exception of a few small sums remitted in coin during the war to London for foreign bondholders, or paid in Virginia in Confederate money, and a small amount paid in 1866 and 1867, no part of the in-

terest or principal was paid.   During the war a portion of her territory was separated from her, and by its people a new State, named West Virginia, was formed, and by the Congress of the United States was admitted into the Union.   Nearly one-third of her territory and people were thus taken from her jurisdiction. But as the whole State had created the indebtedness for which the bonds were issued, and participated in the benefits obtained by the moneys raised, it was but just that a portion of the indebtedness should be assumed by that part which was taken from her and made a new State.   Writers on public law speak of the principle as well established, that where a State is divided into two or more States, in the adjustment of liabilities between each other, the debts of the parent State should be ratably apportioned among them.   On this subject Kent says: " If a State should be divided in respect to territory, its rights and obligations are not impaired; and if they have not been apportioned by special agreement, their rights are to be enjoyed and their obligations fulfilled by all the parts in common." 1 Com. 26.   And Halleck, speaking of a State divided into two or more distinct and independent sovereignties, says: " In that case, the obligations which have accrued to the whole before the division are, unless they have been the subject of a special agreement, ratably binding upon the different parts. This principle is established by the concurrent opinions of text-writers, the decisions of courts, and the practice of nations."   International Law, c. 3, sect. 27.

In conformity with the doctrine thus stated by Halleck, both States — Virginia and West Virginia — have recognized in their Constitutions their respective liability for an equitable proportion of the old debt of the State, and have provided that measures should be taken for its settlement.   The Constitution of Virginia of 1870 declared that the General Assembly should " provide by law for adjusting with the State of West Virginia the proportion of the public debt of Virginia proper to be borne by the States of Virginia and West Virginia," and should " provide that such sums as shall be received from West Virginia shall be applied to the payment of the public debt of the State."   Art. 10, sect. 19.

The Constitution of West Virginia, which went into effect

in 1863, declared that "an equitable proportion of the public debt of the Commonwealth of Virginia, prior to the first day of January, 1861," should "be assumed" by the State, and that the legislature should "ascertain the same as soon as practicable, and provide for the liquidation thereof by a sinking fund sufficient to pay the accruing interest and redeem the principal within thirty-four years." Art. 8, sect. 8.

But notwithstanding these constitutional requirements and various efforts made to adjust the liabilities of West Virginia, nothing was accomplished up to March 30, 1871, and it is stated by counsel that nothing has been accomplished since. As might have been expected, the position of Virginia was not a pleasant one, being charged with the whole indebtedness which accrued before the formation out of her territory of a new State, and entitled to, without being able to obtain, a contribution from the new State of a part of it, corresponding proportionately to her extent and population. She, therefore, undertook to effect a separate adjustment with her creditors, and for that purpose, on the 30th of March, 1871, passed an act known as the "Funding Act" of the State. It is entitled "An Act to provide for the funding and payment of the public debt." Its preamble recited that in the ordinance authorizing the organization of the State of West Virginia it was provided that she should take upon herself a just proportion of the public debt of the Commonwealth of Virginia, prior to Jan. 1, 1861, and that this provision had not been fulfilled, although repeated and earnest efforts in that behalf had been made by Virginia; and then declared that, "to enable the State of West Virginia to settle her proportion of said debt with the holders thereof," and to prevent any complications or difficulties which might be interposed to any other manner of settlement, and "for the purpose of promptly restoring the credit of Virginia, by providing for the certain and prompt payment of the interest on her proportion of said debt, as the same shall become due," the legislature enacted that the owners of the bonds, stocks, or interest certificates of the State (with a few exceptions) might fund two-thirds of the same and two-thirds of the interest due or to become due thereon up to July 1, 1871, in six per cent coupon or registered bonds of the State,

to run thirty-four years, — the bonds to be made payable to order or bearer, and the coupons to bearer. The act declared that the coupons should be payable semi-annually, and " be receivable at and after maturity for all taxes, debts, dues, and demands due the State," and that this should be so expressed on their face. For the remaining one-third of the amount of the bonds thus funded the act provided that certificates should be issued to the creditors, setting forth the amount of the bonds not funded, with the interest thereon, and that their payment would be provided for in accordance with such settlement as might be subsequently had between the two States ; and that Virginia would hold the bonds surrendered, so far as they were not funded, in trust for the holder or his assignees. The bonds of the State, with the accumulated interest, then amounted to over forty millions of dollars.

Under this act a large number of the creditors of the State, holding bonds amounting, including interest thereon, to about thirty millions of dollars, surrendered them and took new bonds with interest coupons annexed for two-thirds of their amount and certificates for the balance. A contract was thus consummated between the State and the holders of the new bonds, and the holders of the coupons, from the obligation of which she could not, without their consent, release herself by any subsequent legislation. She thus bound herself, not only to pay the bonds when they became due, but to receive the interest coupons from the bearer at and after their maturity, to their full amount, for any taxes or dues by him to the State. This receivability of the coupons for such taxes and dues was written on their face, and accompanied them into whatever hands they passed. It constituted their chief value, and was the main consideration offered to the holders of the old bonds to surrender them and accept new bonds for two-thirds of their amount.

In *Woodruff* v. *Trapnall,* reported in 10th Howard, a provision in an act of Arkansas, similar to this one, that the bills and notes of the Bank of the State of Arkansas, the capital of which belonged to the State, should "be received in all payments of debts due to the State of Arkansas," was held to be a contract with the holders of such notes which was binding on

the State, and that the subsequent repeal of the provision did not affect the notes previously issued. " The notes," said the court, " are made payable to bearer; consequently every *bona fide* holder has a right, under the twenty-eighth section " (the one making the notes receivable for dues to the State), " to pay the State any debt he may owe it in the paper of the bank. It is a continuing guaranty by the State that the notes shall be so received. Such a contract would be binding on an individual, and is not the less so on the State." " And that the legislature could not withdraw this obligation from the notes in circulation at the time the guaranty was repealed, is a position which can require no argument." In *Furman* v. *Nichol*, reported in the 8th Wallace, a similar provision in an act of Tennessee, declaring that certain notes of the bank of that State should be " receivable " at the treasury of the State and by tax-collectors and other public officers, " in all payments for taxes and other moneys due the State," was held by this court unanimously to constitute a valid contract between the State and every person receiving a note of the bank. An attempt was made in the case to restrain the operation of the guaranty contained in the provision to the person who received the note in the course of his dealing with the bank, but the court said : " The guaranty is in no sense a personal one. It attaches to the note, — is part of it, as much so as if written on the back of it; goes with the note everywhere, and invites every one who has taxes to pay to take it."

Yet notwithstanding the language of the act of March 30, 1871, providing that the interest coupons of the new bonds should " be receivable at and after maturity for all taxes, debts, dues, and demands due the State," and this was so expressed upon their face, the legislature of Virginia, less than one year afterwards (on the 7th of March, 1872), passed an act declaring that thereafter it should " not be lawful for the officers charged with the collection of taxes or other demands of the State " then due or which should thereafter become due " to receive in payment thereof anything else than gold or silver coin, United States Treasury notes, or notes of the national banks of the United States." This act, as seen on its face, is in direct conflict with the pledge of the State of the previous

year, and with the decisions of this court to which we have referred. Its validity, as might have been expected, was soon attacked in the courts as impairing the obligation of the contract contained in the Funding Act, and came before the Supreme Court of Appeals of the State for consideration in *Antoni* v. *Wright*, at its November Term of 1872. The subject was there most elaborately and learnedly treated. The cases above were cited by the court; and the provision of the Funding Act was shown, by reasoning perfectly conclusive, to be a contract founded upon valuable considerations and binding upon the State. It was earnestly pressed upon the court that it was not within the legitimate power of the legislature to make such a contract; that it would tend to embarrass the action of subsequent legislatures by depriving them of the proper control of the annual revenue, and might, by absorbing the revenue, substantially annul the taxing power and put a stop to the wheels of government. But the court said, among other answers to this, that no rightful power of the State was surrendered by the legislation; but simply a provision made for the payment of the debts of the State; that the annual accruing interest on the debt of the State was in all well-regulated governments deemed an essential part of their annual expenses, and was always annually provided for. The act only made provision for an annual appropriation of a portion of the revenue, derived from taxation, to the payment of existing debts; and such legislation could not be deemed a great stretch of power, when the organic law of the State not only contemplated the punctual annual payment of the interest of her entire debt, but imperatively required, on the creation of a debt, that a sinking fund should be at once established, to be applied solely to its extinction. The organic law thus not merely authorized, but required the legislature which created the debt to bind all future legislatures, by the establishment of a fund to be applied solely to the extinction of the debt. And as to the objection that such legislation might, and probably would, result in crippling the power and resources of the State in time of war or other great calamity, the court said, that legislation cannot well be adapted in advance to extraordinary and exceptional cases; that such cases will occur at all times with all nations,

and must be provided for by the wisdom and prudence of the government for the time being. "At such a time, however," said the court, in words full of wisdom, "the honored name and high credit secured to a State by unbroken faith, even in adversity, will, apart from all other considerations, be worth more to her in dollars — incalculably more — than the comparatively insignificant amount of the interest on a portion of the public debt enjoyed by breach of contract." The court thus expressed a great truth, which all just men appreciate, that there is no wealth or power equal to that which ultimately comes to a State when in all her engagements she keeps her faith unbroken.

These decisions of the Federal and State courts dispose substantially of the question presented in the case at bar. The act of March, 1872, being held to be invalid, the coupons were subsequently, and until March, 1873, received for all taxes due the State to their full amount. On the 25th of that month, the legislature passed an act providing that from the interest payable out of the treasury on bonds of the State, whether funded or unfunded, there should be retained a tax equal in amount to fifty cents on the one hundred dollars of their market value, on the first day in April of each year, and made it the duty of every officer of the Commonwealth, charged with the collection of taxes, to deduct from the matured coupons which might be tendered to him in payment of taxes, or other dues to the State, such tax as was then or might thereafter be imposed on the bonds. The act, in terms, applied to all bonds of the State, whether held by her own citizens or non-residents and citizens of other States or countries. In 1874, the legislature modified this provision so that the tax on the bonds should not be retained from the interest paid on them, when they were the property of non-residents of the Commonwealth. But this exemption was omitted in the act of 1876, providing for the assessment of taxes in the State, in which the provision of the act of 1873 was inserted. It is the validity of this provision requiring the tax levied on the bonds to be deducted from the coupons held by other parties, when tendered in payment of their taxes or other dues to the State, which is presented for our determination.

The power of the State to impose a tax upon her own obligations is a subject upon which there has been a difference of opinion among jurists and statesmen. On the one hand, it has been contended that such a tax is in conflict with and contrary to the obligation assumed; that the obligation to pay a certain sum is inconsistent with a right, at the same time, to retain a portion of it in the shape of a tax, and that to impose such a tax is, therefore, to violate a promise of the government. See Hamilton on the Public Credit, in his works, 3d vol., pp. 514–518.

On the other hand, it is urged that the bonds of every State are property in the hands of its creditors, and, as such, that they should bear a due proportion of the public burdens. In the case of *Murray* v. *Charleston* (96 U. S. 432) there are many pertinent and just observations on this subject which it is not material to repeat, for the question is not necessarily involved in the disposition of the case before us. Whatever may be the wise rule — looking at the necessity in a commercial country for its prosperity that its public credit should never be impaired — as to the taxability of the public securities, it is settled that any tax levied upon them cannot be withheld from the interest payable thereon. Such was the decision of this court in *Murray* v. *Charleston.* There the city had issued certificates of stock, whereby it promised to pay to the owners thereof certain sums of money, with six per cent interest, payable quarterly. Subsequently it imposed a tax of two per cent on the value of all property within its limits for the purpose of meeting the expenses of its government; and, treating its stock as part of such property, directed that the tax assessed upon it should be retained by the treasurer of the city from the interest due thereon. To recover the amount thus retained, which was one-third of the interest stipulated, suit was brought. The city defended its action on the ground that the tax on the stock was not higher than the tax on all other property of its citizens, and that all property in the city was subject to taxation; but the court answered that, by the legislation of the city, its obligation to its creditors was impaired, and, however great its power of taxation, it must be exercised, being a political agency of the State, in subordination to the inhibition of

the Federal Constitution against legislation impairing the obligation of contracts. Until the interest was paid, no act of the State or of its political subdivisions, exercising legislative power by its authority, could work an exoneration from what was promised to the creditor. This decision would be decisive here, but the present case is still stronger for the creditor. The Funding Act made the bonds issued under it payable to order or bearer, and made the coupons payable to bearer. They were, so far, distinct and independent contracts, that they could be separated from each other and transferred to different hands.

In *Clark* v. *Iowa City* we had occasion to speak of bonds of municipal bodies and private corporations having similar coupons, and the language there used is applicable here. We said that most of such bonds "are issued in order to raise funds for works of large extent and cost, and their payment is, therefore, made at distant periods, not unfrequently beyond a quarter of a century. Coupons for different instalments of interest are usually attached to such bonds in the expectation that they will be paid as they mature, however distant the period fixed for the payment of the principal. These coupons, when severed from the bonds, are negotiable and pass by delivery. They then cease to be incidents of the bonds, and become in fact independent claims; they do not lose their validity if for any cause the bonds are cancelled or paid before maturity, nor their negotiable character, nor their ability to support separate actions. . . . They then possess the essential attributes of commercial paper, as has been held by this court in repeated instances. 20 Wall. 583, 589.

Here, also, the coupons held by the petitioner were distinct contracts imposing separate obligations upon the State. He was not the owner of the bonds to which they had been originally attached. In his hands they were as free and discharged from all liability on those bonds as though they had never been connected with them. And surely it is not necessary to argue that an act which requires the holder of one contract to pay the taxes levied upon another contract held by a stranger cannot be sustained. Such an act is not a legitimate exercise of the taxing power: it undertakes to impose upon one the burden which should fall, if at all, upon another.

The Funding Act stipulated that the coupons should be receivable for all taxes and dues to the State, that is, for taxes and dues owing by the holders of the coupons, and for their full amount; and upon this pledge the holders of the bonds of the State surrendered them, and took new bonds for two-thirds of their amount. The act of 1876 declares that the coupons shall not be thus received for taxes and dues owing by the holders of them for their full amount, but only for such portion as may remain after a tax subsequently levied upon the bonds, to which they were originally attached, is deducted, though the bonds be held by other parties. If this act does not impair the contract with the bondholder, — who was authorized to transfer to others the coupons with this quality of receivability for taxes annexed, — and also the contract with the bearer of the coupon written on its face that it should be received for all taxes to the State, it is difficult to see in what way the contract with either would be impaired, even though the tax on the bond should equal the whole face of its coupons. If, against the express terms of the contract, the State can take a portion of the interest in the shape of a tax on the bond, it may at its pleasure take the whole.

We are clear that this act of Virginia of 1876 (sect. 117), requiring the tax on her bonds, issued under the Funding Act of March 30, 1871, to be deducted from the coupons originally attached to them when tendered in payment of taxes or other dues to the State, cannot be applied to coupons separated from the bonds, and held by different owners, without impairing the contract with such bondholders contained in the Funding Act, and the contract with the bearer of the coupons. It follows that the petitioner was entitled to a writ of *mandamus* to compel the treasurer of the city of Richmond to receive the coupons, tendered to him in payment of taxes due the State, for their full amount.

The judgment of the Supreme Court of Appeals denying the writ must, therefore, be reversed, and the case remanded for further proceedings in accordance with this opinion; and it is

                                                    *So ordered.*

MR. JUSTICE MILLER dissenting. I dissent from the judgment of the court. In addition to the general proposition which I have always maintained, that no legislature of a State has authority to bargain away the State's right of taxation, I am of opinion that in issuing the bonds and coupons which are the subject of this controversy the legislature of Virginia, neither in terms nor by any just inference, made any contract that the bonds and coupons should not be subject to the same taxes as other property taxed by the State.