# COMMONWEALTH OF VIRGINIA *v.* STATE OF WEST VIRGINIA.

## IN EQUITY.

No. 4, Original: Forms of decree appointing special master, submitted April 7, 1908.—
Form of decree announced May 4, 1908.

Order referring cause to master and directing conditions under which testimony shall be taken and master shall report to this court.

Defendant's demurrer having been overruled, 206 U. S. 290, 322, and defendant having answered, both complainant and defendant submitted and sustained by argument forms of decree referring the cause to a master.[1]

*Mr. William A. Anderson,* Attorney General of the State of Virginia, and *Mr. Randolph Harrison,* for complainant:

The differences go rather to matters of procedure than to

---

[1] Complainant's draft of decree referring the cause to a master.

This cause coming on this day to be heard upon the complainant's bill and the exhibits filed therewith, the answer of the defendant, with the exhibits filed therewith, and the general replication filed by the complainant thereto, was argued by counsel. On consideration whereof it is adjudged, ordered, and decreed that this cause be referred to —— ——, who is hereby appointed a special master herein, who, after giving not less than ten days' notice to the parties of the times and places fixed by him, from time to time, for executing this decree,will without delay ascertain and report to the court:

I.

The amount of the public debt of the Commonwealth of Virginia as of the first day of January, 1861, stating specifically, how and in what form the same was evidenced, by what authority of law and for what purposes the same was created, and the dates and nature of the bonds or other evidences of said indebtedness.

II.

What amount and proportion of said indebtedness and of the interest accrued thereon should in equity be apportioned to and be now paid by the State of West Virginia.

(Complainant subsequently suggested the following substitute for paragraph II.)

II.

What is the just amount and proportion of said debt, including the interest thereon, which should now be apportioned to, and paid by, the State

any question of principle, as between pars. III and IV, complainant's draft, and par. VII, defendant's draft.

Complainant asks that the provisions expressed in pars. III,

---

of West Virginia? Such amount and proportion of said debt the master will ascertain by charging against West Virginia:

(1) All expenditures made by the State of Virginia within the territory which now constitutes the State of West Virginia since any part of said debt was contracted.

(2) Such proportion of the ordinary expenses of the government of Virginia since any part of said debt was contracted as was fairly assignable to the counties which were erected into the State of West Virginia.

In ascertaining this, the master will take as the basis or criterion upon which the apportionment of said expenses shall be made the average total population of Virginia, excluding slaves, as nearly as the same can be determined from the United States Census for each of the decades in which such expenses were incurred and paid.

(3) The amount and value of all money, property, stocks, and credits which West Virginia received from the Commonwealth of Virginia, not embraced in any of the preceding items and not including any property, stocks, or credits which were obtained or acquired by said Commonwealth after the 19th day of June, 1861, the date of the organization of the restored government of Virginia.

(5) From the aggregate of the amounts thus ascertained, the master will deduct all moneys paid into the treasury of said Commonwealth from the counties included within the State of West Virginia during said period.

(6) The balance thus ascertained, with interest thereon from the 1st day of January, 1861, until the same shall be paid, will be the amount and proportion of the debt of the Commonwealth of Virginia existing before that date, assignable to West Virginia and which that State should pay.

### III.

He will make and return with his report any special or alternative statements of the accounts between the complainant and the defendant in the premises which either may desire him to state or which he may deem to be desirable to present to the court.

It is further adjudged, ordered, and decreed as follows:

(1) To the end that full and complete information may be afforded the master as to all matters involved in the inquiries with which he is charged by this decree, the Commonwealth of Virginia and the State of West Virginia shall each of them respectively produce before the master, or give him access to, all such records, books, papers, and public documents as may be in their possession or under their control and which may, in his judgment, be pertinent to the said inquiries and accounts or any of them.

And the master is authorized to visit the capitals of Virginia and West Virginia, and to make or cause to be made such examinations as he may

IV and V, its draft, be embodied in the decree for reasons which will be apparent on reading those paragraphs.

The serious objections to the defendant's draft of decree

---

deem desirable of the books of account, documents, and public records of either State relating to the inquiries he is directed to make, and to cause copies thereof or extracts therefrom to be made for use in making up his report.

All published records published by authority of the Commonwealth of Virginia prior to the creation of the State of West Virginia and all papers and documents and other matter constituting parts of the public files and records of Virginia prior to the partition of her territory which, in the judgment of the master, may be relevant and pertinent to any of said inquiries, or copies thereof, if duly authenticated, may be used in evidence and considered by the master. The public acts and records of the two States since the creation of the State of West Virginia shall be evidence if pertinent and duly authenticated; but all such testimony tendered by either party shall be subject to proper legal exception as to its competency.

The master is empowered to summon any persons whose testimony he or either party may deem to be material, and to cause their depositions to be taken before him or by a notary public or other officer authorized to take the same, after reasonable notice to the adverse party.

(2) The master is authorized and empowered to employ such accountants, stenographers, or other clerical assistance as he may find it desirable to employ, and to secure such rooms or offices as he may require, in order to the prompt and efficient execution of this order of reference, and to agree with such accountants and stenographers, typewriters, and the owner of such room or rooms for such compensation to be made to them as the master may consider reasonable and just. He is authorized to direct their compensation to be paid out of the funds to be deposited to the credit of this cause.

(3) The complainant will cause the sum of three thousand dollars to be deposited with the marshal of this court to the credit of this cause, on account of the costs and expenses of executing this decree and of this suit, and the complainant will cause such further sums as may be necessary to defray the costs and expenses of executing this decree to be from time to time in like manner deposited with said marshal. In the event that the defendant shall desire any special statement or accounts to be made, she shall in like manner, before the taking of any such account or the making of such special statement, cause the sum of —— dollars to be deposited with the marshal.

And the master is authorized from time to time to draw upon the funds so deposited by Virginia for the compensation of the accountants and other clerical assistants whom he may employ, and for any other costs or expenses, including stationery, printing, and room rent, which it may in his judgment be necessary to be incurred in promptly and efficiently executing this order of reference or making up any special statement or accounts asked for by the plaintiff, and the same will be charged up as part of the complainant's

are particularly to par. II. but also to pars. III, IV and V thereof.

Complainant's draft directs the master to take an account ascertaining:

costs; and he will draw upon the fund deposited by the defendant for any costs which may be incurred in making up any special statement or accounts which may be desired by the defendant to be specially stated, which drafts, accompanied by proper vouchers, the marshal of this court will pay, and the same will be charged up as part of the defendant's costs in the cause.

And the said marshal is allowed to have and retain a commission of five per centum for his services in receiving and disbursing the funds so deposited with him, and he will make a report of his transactions, receipts, and disbursements in the premises to the court.

### IV.

The first notice of the time and place fixed by the master for beginning the taking of the accounts directed by this decree shall be given at least thirty days before the date fixed by him therefor, provided that the date so fixed by the master for beginning the taking of said accounts shall not be a day earlier than February 20, 1907. The master may adjourn his sittings from time to time and place to place without notice to the parties. He will cause to be kept, in a minute book to be provided for the purpose, a journal or minutes of his sittings in the execution of this decree, showing the counsel present, if any, any adjournments which may be taken by him from time to time or place to place, and any other matters which the master may deem it proper to mention therein, which minute book or journal he will return with his report.

### V.

Any notices to be given in connection with the execution of this decree may be given to the Attorneys-General of the respective States.

Defendant's draft of decree referring the cause to a master.

This cause came on this day to be heard upon the complainant's bill and the exhibits filed therewith; the answer of the defendant, with the exhibits filed therewith; the general replication thereto by the complainant, and was argued by counsel, and on consideration of which it is adjudged, ordered, and decreed that this cause be, and the same is hereby, referred to ——— ———, who is appointed a special master herein, who, after giving — days' notice to the parties of the times and places fixed by him, from time to time, for executing this decree, will ascertain and report to the court:

### I.

The amount of the public debt of the Commonwealth of Virginia on the first day of January, 1861, stating specifically how and in what form the

"The amount of the public debt of the Commonwealth of Virginia as of the first day of January, 1861, stating specifically, how and in what form the same was evidenced, by what

same was evidenced, by what authority of law and for what purposes the same was created, and the dates and nature of the bonds or other evidences of said indebtedness.

## II.

(a) The amount of state expenditures made by the Commonwealth of Virginia prior to the first day of January, 1861, within the territory now included within the State of West Virginia since any part of said indebtedness was contracted, as provided by the ordinance adopted by the Commonwealth of Virginia at Wheeling, August 20, 1861.

(b) The aggregate ordinary expenses of the state government of the Commonwealth of Virginia prior to January 1, 1861, and since any part of said indebtedness was contracted.

(c) All moneys paid into the treasury of the Commonwealth of Virginia from the counties included within the State of West Virginia during said period.

## III.

Whether any agreements, contracts, or arrangements, other than those appearing from the exhibits filed with the bill herein, have been made by the Commonwealth of Virginia with her creditors since January 1, 1861, with reference to said public debt created prior to said date, or to the satisfaction or discharge of said indebtedness or any part thereof.

## IV.

The amount of certificates relating to said indebtedness issued by the Commonwealth of Virginia under the acts of her General Assembly, approved March 30, 1871, March 28, 1879, February 14, 1882, and February 20, 1892; and what amount, if any, of said certificates have been deposited since January 4, 1906, with the commission appointed under the joint resolution of the General Assembly of the Commonwealth of Virginia approved March 6, 1894; and he will also ascertain and report what amount of said certificates so deposited since said date were issued under the act of March 30, 1871; what amount were issued under the act of March 28, 1879; what amount were issued under the act of February 14, 1882, and what amount were issued under the act of February 20, 1892.

## V.

The master will ascertain and report to what extent said certificates issued by the Commonwealth of Virginia represented the principal of one-third of said public debt and to what extent they represented the interest thereon, and the rate at which the interest was reckoned; and he will also ascertain

authority of law and for what purposes the same was created, and the dates and nature of the bonds or other evidences of said indebtedness."

and report whether there is included in said certificates, or in any of them, the interest, or any part of the interest, which had accrued on the portion of said public debt refunded by the Commonwealth of Virginia, and if so, what was the total amount of such interest and at what rate it was reckoned.

### VI.

It is further ordered and decreed that the master shall ascertain and report what amount, if any, of the bonds or other evidences of debt issued by the Commonwealth of Virginia under the act of March 30, 1871, was subsequently surrendered by the holders thereof and exchanged for other bonds or evidences of debt issued under the acts of 1879, 1882, and 1892, and if such exchanges were made, the master will ascertain and report what rate of interest was agreed to be paid upon such new bonds or evidences of debt.

### VII.

It is further ordered and decreed that the Commonwealth of Virginia and the State of West Virginia shall each produce before the master all such records, books, papers, and public documents as may be in their possession or under their control, and which may, in his judgment, be pertinent to the said inquiries and accounts or any of them.

And the master is authorized to make or cause to be made such examination as he may deem desirable of the books of account, vouchers, documents, and public records of either State relating to the inquiries he is herein directed to make, and to cause copies thereof or extracts therefrom to be made for use in making up his report.

All public records published by authority of the Commonwealth of Virginia prior to the seventeenth day of April, 1861, and all papers and documents and other matter constituting parts of the public files and records of Virginia prior to the date aforesaid which in the judgment of the master may be relevant and pertinent to any of said inquiries, or copies thereof, if duly authenticated, may be used in evidence and considered by the master, but all such evidence shall be subject to exceptions to its competency. The public acts and records of the two States since the admission of West Virginia into the Union shall be evidence, if pertinent and duly authenticated, but all such evidence tendered by either party shall be subject to proper legal exceptions to its competency.

The master is empowered to summon any persons whose testimony he or either party may deem to be material, and to cause their depositions to be taken before him, or by a notary public or other officer authorized to take the same, after reasonable notice to the adverse party.

The master is authorized and empowered to employ such stenographers and other clerical assistants as he may find it desirable to employ in order

The defendant's draft adopts this paragraph.

Par. II, plaintiff's draft, directs the master to take the following accounts:

"What amount and proportion of said indebtedness and of the interest accrued thereon, should in equity be apportioned to and be now paid by the State of West Virginia."

Par. II, defendant's draft, directs the master to take the following accounts:

(a) "The amount of state expenditures made by the Commonwealth of Virginia prior to the first day of January, 1861, within the territory now included within the State of West Virginia since any part of said indebtedness was contracted, as provided by the ordinance adopted by the Commonwealth of Virginia at Wheeling, August 20th, 1861.

(b) "The aggregate ordinary expenses of the state government of the Commonwealth of Virginia, prior to January 1st, 1861, and since any part of said indebtedness was contracted.

(c) "All moneys paid into the treasury of the Commonwealth of Virginia from the counties included within the State of West Virginia during said period."

---

to the prompt and efficient execution of this order of reference, and to agree with such stenographers and typewriters and clerical assistants upon such compensation to be made to them as the master may consider reasonable and just. He is authorized to direct their compensation to be paid out of the funds to be deposited to the credit of this cause.

The complainant shall cause the sum of three thousand dollars to be deposited with the marshal of this court to the credit of this cause, and such further sums as from time to time may be required, on account of the costs and expenses of executing this decree; and the master is authorized from time to time to draw upon the fund so deposited by Virginia for the compensation of the stenographers, typewriters, and other clerical assistants whom he may employ, and for any other costs and expenses, including stationery and printing, which may in his judgment be necessary to be incurred in executing this order of reference.

The said marshal is allowed to have and retain a commission of 5 per centum for his services in receiving and disbursing the funds so deposited with him, and he will make a report of his transactions, receipts, and disbursements in the premises to the court.

Any notices to be given in connection with the execution of this decree may be given to the Attorneys General of the respective States.

Par. III, plaintiff's draft, directs that the master "will make and return with his report any special or alternative statements of the accounts between the complainant and the defendant in the premises which either may desire him to state or which he may deem to be desirable to present to the court."

Complainant objects to par. II, defendant's draft, on the ground that it seems to lend the sanction of the court in advance to a basis or scheme for the statement of the account, which is not shown by anything as yet in the cause to be either equitable or just.

Before any such question can be fairly adjudicated, it is necessary that the evidence in the case be taken and have the aid of its master in collating and thoroughly digesting it.

There is not enough in the record to enable the court to come to any just or definite conclusion as to the precise scheme which it would be equitable to adopt in stating the account. To do so at this stage of the litigation, would be to decide an important question in the case before the evidence is taken. The effect of par. II would be to have the court prejudge the case as to the basis on which the account shall be stated.

The case is now only submitted for a decree referring it to a master, to state and report to the court the data necessary to enable the court to justly decide it upon its merits.

If it should then appear that the basis prescribed by the Wheeling ordinance is binding upon the parties, and must be followed as the basis upon which the account shall be made up, that basis would be adopted. But if it should be then manifest that that arbitrary basis of settlement is not the one on which the account should be stated, because it would, if applied to the facts of the case as they shall appear in the evidence, lead to absolutely unconscionable results and operate to impair the obligation of the contracts by which the common debt was created, contracts which were and are alike obligatory upon Virginia and upon West Virginia, or for any other valid reason, then the scheme of settlement indicated in the

Wheeling ordinance would have to be discarded, and an equitable basis and scheme of settlement adopted.

Complainant contends that, while the Wheeling ordinance upon its face, prescribes an absolutely arbitrary basis of settlement, the representatives of Virginia are satisfied that upon a fair, reasonable and just construction of the language of that ordinance, and of the subsequent supplemental enactments, the scheme of settlement therein defined will, when applied to the facts as stated in the bill, and as it is believed they can be established by proofs, result in fixing the proportion of the debt of Virginia which West Virginia should assume and pay, inclusive of interest, at a very large sum, though not so large a sum as it would be equitable for West Virginia to pay.

The debt, a portion of which she was to pay, was an interest-bearing debt. It would be manifestly "just" and "equitable" that West Virginia should be required to pay interest as well as principal. Indeed, any settlement which does not require that State to pay interest during the long period of her default and refusal to pay anything, would be not only unjust, and inequitable, but iniquitous.

West Virginia came into the Union upon the distinct condition expressed in her constitution, that she would assume an equitable proportion of the common debt of the undivided State, as it existed prior to January 1, 1861, and would provide for the payment of the accruing interest and the redemption of the principal thereof.

While it is believed that, upon the facts stated in the bill and accompanying exhibits, and upon the proofs hereafter to be adduced in support thereof, West Virginia will owe a very large sum, even under the arbitrary scheme of the Wheeling ordinance, we submit that we should not, in the present status of the litigation, be tied down to the terms of that ordinance.

Another palpable objection to the defendant's draft is, that it excludes from the account the value of the property, assets, and money which West Virginia has received from the Com-

monwealth. Upon any basis of just accounting, these items should be brought into the account.

If the account should be stated on the basis of the Wheeling ordinance, these items would manifestly be proper charges against West Virginia. By the terms of that ordinance, Virginia's title to, and ownership of, all of the property and assets theretofore belonging to the Commonwealth remain intact.

By it, West Virginia would acquire no title to any of those assets or of that property. Framed as that ordinance was, by Western Virginians, and arbitrary, and on its face unjust, as were the criteria by which it undertook to provide that West Virginia's proportion of the common debt should be computed, its authors were not so conscienceless as to also propose that the new State, after making such an inadequate contribution to its share of a debt which had been chiefly contracted by the votes of the representatives of its people and for their benefit, should also have a share of the property and assets of the Commonwealth, free of charge.

All that was, by the terms of that ordinance, to be ceded by the Commonwealth to the new State, was political dominion, and jurisdiction over the people and territory embraced in the new State.

The meaning and effect of the ordinance was to leave the title to, and ownership of, the assets and property of the Commonwealth in the Commonwealth.

Another objection to the account called for by defendant's draft, is that it does not direct any account to be taken ascertaining the amount and proportion of the debt of Virginia on and prior to January 1, 1861, which West Virginia should assume and pay, but contents itself with merely directing the arbitrary and inconsequential accounts defined in par. II, defendant's draft.

Complainant's principal insistance is that defendant's draft of a decree prejudges the case in advance of a hearing upon the merits, while that tendered for the plaintiff cannot operate to the prejudice of either party, upon any material question in

the cause; by this draft the adjudication of these questions being left to await a hearing after the master's report shall be filed, upon the evidence then fully in the cause.

. The precise accounts called for by par. II, defendant's draft, will be taken by the master if he shall find it necessary and proper to take them in order to ascertain the amount and proportion of the Virginia debt which West Virginia should pay; and if the master shall for any reason deem it unnecessary to take those accounts, the defendant can, under par. III, complainant's draft, have them stated as special accounts, if she shall be so advised.

Par. III of complainant's draft is designed to enable each party, or the master, to have alternative, or special statements of the accounts made up on any basis on which either party or the master may deem it proper or desirable that the same shall be stated.

By having the respective views and contentions of the complainant and the defendant thus presented in contrast in such concrete form, the court, with the assistance of the findings of the master, will be enabled more readily and intelligently to reach a just conclusion.

If the inquiries defined in pars. III, IV, V and VI, defendant's draft, have any pertinency to any question in the case, it must be because of something not yet in the record.

Complainant objects to them as being unnecessary and irrelevant.

There is nothing in the cause, or so far as we know out of it, to show that there is any foundation in fact for the inquiry mentioned in par. III, defendant's draft, as to whether Virginia has made any other contracts or arrangements with the public creditors, since January 1, 1861, in reference to the public debt. That inquiry, though harmless, is useless.

. The accounts provided for in pars. IV and V, defendant's draft, are not pertinent to any issue in the cause.

Both relate to the certificates or receipts given by Virginia to the holders of the bonds issued by the Commonwealth be-

fore her dismemberment, who have deposited these bonds with her.

. Those certificates are in the nature of a declaration of trust . by Virginia, that she holds said bonds (so far as they have not been funded in the new securities which the Commonwealth has given for about two-thirds of the aggregate amount thereof, principal and interest), for the benefit of the owners of the bonds deposited with her.

Those transactions cannot in any way affect any question in the cause.

The only function of those certificates is to show who are now entitled to the bonds which were so deposited with Virginia, and which she holds in her treasury for the benefit of these certificate holders, awaiting a settlement with West Virginia. These inquiries are unnecessary and useless.

The same objection applies to par. VI, defendant's draft. That relates to the obligations which were issued by Virginia, as now constituted, in settlement of the two-thirds of the old bonds funded, and payment of which was assumed by her.

That is a matter with which West Virginia has nothing to do, and which does not affect the rights or obligations of either party in respect to the claims asserted in complainant's bill.

Those new bonds given by Virginia for the two-thirds of the old bonds assumed by her, and accepted by the owners of the old bonds so deposited with Virginia, operated as a payment and discharge of the old bonds to the extent of the two-thirds thereof so funded.

West Virginia is not sued here to pay any part of that two-thirds so settled by Virginia. She is sued to have her assume and pay so much of the remaining unfunded third of the common debt of the undivided State, as may be West Virginia's equitable portion of the whole of the debt represented by the bonds of the original State. It has never been claimed or suggested that there was any liability on West Virginia beyond said unfunded third of the bonds of the original State which have been funded; or that West Virginia should pay more than

one-third of the bonds issued by Virginia prior to the forma-
tion of West Virginia, which have not been funded.

The liability of West Virginia on account of the common
public debt, has sometimes been estimated by Virginia or her
representatives at one-third thereof, but never at more than
one-third, and Virginia has undertaken to take care of the
other two-thirds with which West Virginia has nothing to do.

It is true, that there are some millions of the debt of the
undivided State, which Virginia has paid in full, and holds the
obligations so taken up by her as a claim against the new State,
to the extent of West Virginia's equitable liability for contri-
bution therefor; and the extent of that liability can be ascer-
tained and stated in the account directed by par. II, com-
plainant's draft.

There is no occasion for any of the accounts directed by
pars. III, IV, V and VI, defendant's draft. If West Virginia
wants any of them to be stated, she can have that done as a
special statement under par. III of complainant's draft.

*Mr. John G. Carlisle* and *Mr. John C. Spooner,* with whom
*Mr. C. W. May,* Attorney General of the State of West Vir-
ginia, *Mr. Charles E. Hogg, Mr. W. Mollohan, Mr. George W.
McClintic* and *Mr. W. G. Matthews* were on the brief, for de-
fendant:

The difference between the two proposed decrees is radi-
cal, and presents to the court a question which in our view
is fundamental and which West Virginia contends, respect-
fully and very earnestly, should be decided before any reference
to a master to state the account between the parties.

The jurisdiction of the court over this case is settled by the
decision overruling the demurrer. We are quite aware that
the court has recognized a distinction between suits by private
parties in respect of the application of the rules of pleading
and of practice, and suits between States. *Rhode Island* v.
*Massachusetts,* 13 Peters, 23; *Rhode Island* v. *Massachusetts,*
14 Peters, 256.

West Virginia does not and could not successfully here contest the principles thus laid down, but the principles of equity and the rules of chancery procedure so far as essential to protect the rights of parties litigating in this tribunal will, of course, be substantially enforced. The application of some of the rules of procedure are certainly essential to substantial justice. 2 Bates, Fed. Eq. Pro. 802, § 753.

Thus it stands alleged in the bill and admitted by the answer, and if it were not admitted by the answer, it is conclusively established by the bill and its exhibits, that there was a solemn agreement entered into in 1861 between the State of Virginia and the new State of West Virginia, with the consent of the Congress, by which the latter State assumed (as one of the conditions of the assent of Virginia to her becoming a State) a just proportion of the indebtedness of that Commonwealth as it existed prior to January 1, 1861, the manner of ascertaining which proportion was defined by the ordinance itself.

The ordinance was, as treated by this court in the case of *Virginia v. West Virginia,* 11 Wallace, 39, a proposition by the Commonwealth of Virginia to the people of the proposed new State. It was accepted by the constitutional convention of the proposed new State, carried into its constitution and adopted by the people; and when the State was admitted into the Union by the Congress, with the assent of Virginia, it became a completed compact between competent parties, upon adequate consideration, protected by the Constitution of the United States from impairment by either party.

The ordinance defines what would be a just proportion; for it provides not only for the assumption of a just proportion, but specifically in what manner that proportion shall be ascertained.

The obligation of a lawful compact between two States, justiciable in its nature, certainly is as binding in law upon both until abrogated by both in a constitutional way, as a contract between a State and an individual, or between two individuals, and a disregard or violation of it by one, certainly cannot thereby release it from its obligation.

From the averments of the bill and the admissions in the answer, and the argument at the bar, it cannot be an open question in this case that the only liability of West Virginia for an equitable proportion of the *ante-bellum* debt of Virginia is upon the basis of the ordinance.

The general rule stated in *Hartman* v. *Greenhow*, 102 U. S. 672, to the effect that where a State is divided into two or more States, in the adjustment of liabilities between each other, the debts of the parent State should be ratably apportioned among them, is essentially qualified by the authorities there quoted, in this, that a special agreement between the two States in respect of the assumption of a proportion of the debt as it existed before the separation, takes the case out of the general rule; so that the second ground alleged in the bill which specifically avers a special agreement, destroys the applicability of the rule to this case. This special agreement cannot be dismissed from this case as the decree proposed on behalf of Virginia would do. This court has sustained the validity of this ordinance in *Virginia* v. *West Virginia*, 11 Wallace, 39, in respect of the provision contained in it for the incorporation of the counties of Berkeley and Jefferson in the latter State conditioned upon a popular vote therefor.

If the ordinance was valid then in respect of the incorporation of these counties, it cannot be held to be invalid as to the specific provision contained in § 9 for the assumption by the new State of a just proportion of the indebtedness to be ascertained in the manner defined, clearly carried into the constitution of the new State and assented to by Congress by the admission of West Virginia into the Union.

Whether it was or was not the lawful government of Virginia was a political question. When the House of Representatives admitted the members of Congress from that State and the Senate admitted the senators elected by the legislature of the "Restored State," and the President recognized that government as the true government of Virginia, that forever settled

its legality and regularity beyond the power of judicial review and made valid its acts *ab initio*. But for that "Restored State of Virginia," and its recognition by the political departments of the Federal Government, there would have been no government of Virginia under the Constitution of the United States from April, 1861, to the close of the war. The ordinance of the Wheeling convention of 1861, which was the genesis of the State of West Virginia, and the adoption of its constitution, are, from the standpoint of law, as clearly acts of the Commonwealth of Virginia as if they had taken place in 1851 instead of in 1861.

An agreement between States, such as this special agreement in respect to the proportion of the debt of Virginia which was to be assumed by the State of West Virginia, when consented to by Congress, binds the citizens of both States, and is irrevocable by either party. Where the legislation of either has attempted to impair the obligation of a compact, it has been held void under the Constitution of the United States. *Greene* v. *Biddle*, 8 Wheat. 1; *Rhode Island* v. *Massachusetts*, 12 Peters, 748, and cases cited.

The Wheeling ordinance was carried into the constitution of West Virginia as follows:

"ARTICLE VIII. Section 8. An equitable proportion of the public debt of the Commonwealth of Virginia prior to the 1st day of January, 1861, shall be assumed by this State, and the Legislature shall ascertain the same as soon as may be practicable, and provide for the liquidation thereof by a sinking fund sufficient to pay the accruing interest and to redeem the principal within thirty-four years."

The convention assembled within ninety days after the adoption of the ordinance. Its sole warrant for assembling was the ordinance. Its authority to frame the constitution was derived from the ordinance. The ordinance as a whole was a proposition to that convention and, as a whole, was accepted by the convention. The convention complied with all the provisions of the ordinance. The constitution was framed to

meet all the requirements of the ordinance. It was the basis of the constitution.

The inconsistent attempt to eliminate the ordinance from the case—the present posture of counsel for Virginia—is in order that the ordinance may be eliminated, and § 8 of the first constitution is to be construed as the assumption by the new State of an equitable proportion of the public indebtedness of Virginia prior to January 1, 1861, upon the basis of population and territory. Such cannot be the law of this case. The assembling of the convention was an acceptance of § 9 of the ordinance. The ordinance embodied the conditions, and § 9 by no means the least important of them, of Virginia's consent to the erection of the new State out of her territory.

The suggestion that § 8 of Article 8 of the constitution had no reference to § 9 of the ordinance, assumes that the new State was taking upon herself an equitable proportion of the public debt of the Commonwealth of Virginia prior to the first day of January, 1861, without definition or understanding as to the basis upon which it was to be ascertained, therefore leaving open the vital question as to what would constitute an equitable proportion, for future adjustment between the two States. This is not to be believed.

The debt of Virginia on January 1, 1861, was doubtless well known throughout the State of Virginia. It is alleged in the bill that about $33,000,000 of it were incurred in connection with the construction of works of internal improvement. If it had been the purpose of Virginia, in requiring as a condition of her assent, the assumption by the proposed new State of an equitable proportion of the public debt without specification as to the manner in which, and the basis upon which that proportion should be ascertained, it is inconceivable that the language of § 9 of the ordinance would have been what it was, and that the language of § 8 of Article 8 of the constitution would have been what it was. It was entirely for Virginia to dictate the terms, and if it had been her purpose to require an assumption of the debt upon the basis of territory and popu-

lation, West Virginia would have been required to assume "one-third of the debt as it existed prior to the first day of January, 1861," or "an equitable proportion to be ascertained upon the basis of territory and population."

If the ordinance be valid and binding, it cannot be disregarded by the court. While West Virginia could not by any suit prevent Virginia from disregarding it in the adjustment with her creditors of her debt or any portion of it, when Virginia invokes the original jurisdiction of this court in a suit against West Virginia to compel her to account for an equitable proportion of her debt prior to January 1, 1861, upon the basis of the ordinance and upon other and different bases, she may plead the ordinance as the only basis upon which the court can decree an accounting by her. The court will not make a new contract for the parties. They were competent to make one for themselves, and they did make one for themselves. It is unfortunate that the two States were unable many years ago to adjust the matter in accordance with the agreement which they had entered into and which subsists between them. West Virginia is entitled to have the question whether or not the special agreement as to what shall constitute a just proportion of the debt solemnly entered into between the two States is binding, determined at this juncture by the court and, if it be held to be a binding agreement, Virginia is entitled to no accounting with West Virginia in this suit for her equitable proportion of the debt of the Commonwealth prior to January 1, 1861, except under the terms of that ordinance, carried into the constitution.

Complainant's draft directs that the master—"III. Make and return with his report any special or alternative statements of the account between the plaintiff and the defendant in the premises which either may desire him to state or which he may deem to be desirable to present to the court." This asks the court to leave the determination of the pivotal point in the case, which defendant contends should be decided by it in advance of an accounting, to a master, albeit only in

an advisory way, and it gives West Virginia permission to have an accounting made, if she desires it, on the basis of the ordinance at her own expense. She is defendant here. In that event we would have two lines of investigation proceeding before the master at the same time, each entirely distinct in basic principle from the other, each burdensome in labor, expense and the consumption of time. Neither would throw any light upon the other. An exhaustive accounting under the ordinance would not aid the court in determining whether it is binding and the only legal basis of settlement or not. An exhaustive investigation upon the international law basis would no more aid the court in determining whether the ordinance is binding and therefore the sole ground upon which the liability of West Virginia to an accounting at all can be based. If the compact is in force, any accounting save under that will be not only burdensome, but superfluous.

Defendant's draft is in literal execution of the contract of the parties, as evidenced by the ordinance and § 8 of the first constitution.

It directs the master to ascertain and report:

(a) The amount of state expenditures made by the Commonwealth of Virginia prior to the first day of January, 1861, within the territory now included within the State of West Virginia, since any part of said indebtedness was contracted, as provided by the ordinance adopted by the Commonwealth of August 20, 1861.

Defendant agrees that the last clause need not be inserted.

(b) To ascertain the aggregate ordinary expenses of the state government of the Commonwealth prior to January 1, 1861, and since any part of said indebtedness was contracted.

(c) All moneys paid into the treasury of the Commonwealth of Virginia from the counties included within the State of West Virginia during the said period.

The items (a) and (b) are, under the ordinance, to be charged to West Virginia.

The item (c) is under the ordinance to be credited to the

State of West Virginia, and when these three steps shall have been taken, and the two items charged, and the one item credited, the sum which it was agreed between the two States should constitute a just proportion of the debt of the Commonwealth of Virginia prior to January 1, 1861, which West Virginia assumed, will have been ascertained. These provisions are not "arbitrary and inconsequential items."

They are the items which Virginia herself framed and required to be accepted by the proposed new State as a condition of assent to her separation and admission into the Union.

There is but one item in § 9—defining the manner in which the account should be taken in order to ascertain the proportion of the debt to be taken upon herself by the proposed new State—left at all indefinite, and that is item (b), " 'a just proportion' of the ordinary expenses of the state government, since any part of said debt was contracted." This involves a determination of the basis upon which a "just proportion" of the aggregate ordinary expenses of the state government during the said period is to be ascertained. Shall it be population or territory, or both, or taxable values? Defendant contends that it should be based upon population, since "government"—including the administration of justice, the making and administering of the laws, the education of the children through a system of common schools, academies and a state university, the maintenance of state institutions, the support of prisoners, the care of the insane and paupers, and the like—is for people, not acres. Defendant suggests there should be added to defendant's draft, in respect of an ascertainment of the aggregate ordinary expenses of the State, a direction to the master to find alternatively certain facts substantially as follows: "For the purpose of enabling the court to determine the just proportion of the aggregate of the ordinary expenses of the state government of the Commonwealth of Virginia prior to January 1, 1861, and since any part of said indebtedness was contracted, said master shall ascertain and report the population during the said period of the counties now con-

stituting the Commonwealth of Virginia, and separately the population of the counties now constituting the State of West Virginia, as shown by the decennial censuses taken during the said period by the United States, and also the average population of Virginia during each of said periods of ten years."

The aggregate ordinary expenses being found, and the items suggested as to population, it will be easy to determine the "just proportion" if that is the proper basis.

This case should not be cast at large, with no definition of the principles to govern his action, into the hands of a master; that at least it should be settled before a reference for the purpose of taking an account, whether the liability of West Virginia to Virginia is upon the special agreement which preceded and accompanied her admission into the Union, or, because of the absence of a special agreement, upon the basis of population and territory.

It will be observed that in par. II, complainant's draft, the master is not only directed to ascertain the amount and proportion of said indebtedness, but " of the interest accrued thereon."

Defendant objects to this paragraph because there is no legal ground for directing the ascertainment of interest. West Virginia has not obligated herself in any manner for the payment of interest. A State is not liable to pay interest unless it has expressly contracted to do so. See *United States* v. *North Carolina*, 136 U. S. 211.

See also, following this principle, *Sawyer* v. *Colgan*, 102 California, 293; *Hawkins* v. *Mitchell*, 34 Florida, 421, 422; *Molineux* v. *State*, 109 California, 380; *Flint &c. R. R.* v. *Board of Auditors*, 102 Michigan, 502; *Carr* v. *State*, 127 Indiana, 204.

See also note, 22 American State Reports, 448.

By leave of court, *Mr. Holmes Conrad* made an argument herein as *amicus curiæ*.

On May 4, 1908, THE CHIEF JUSTICE announced the following decree:

This cause having been heard upon the pleadings and accom-

panying exhibits, it is, on consideration, ordered that it be referred to a special master, to be hereinafter designated,[1] to ascertain and report to the court:

1. The amount of the public debt of the Commonwealth of Virginia on the first day of January, 1861, stating specifically how and in what form the same was evidenced, by what authority of law and for what purposes the same was created, and the dates and nature of the bonds or other evidence of said indebtedness. ·

2. The extent and value[2] of the territory of Virginia and of West Virginia June 20, 1863, and the population thereof, with and without slaves, separately.

3. All expenditures made by the Commonwealth of Virginia within the territory now constituting the State of West Virginia since any part of the debt was contracted.

4. Such proportion of the ordinary expenses of the government of Virginia since any of said debt was contracted, as was properly assignable to the counties which were created into the State of West Virginia on the basis of the average total population of Virginia, with and without slaves, as shown by the census of the United States.

5. And also on the basis of the fair estimated valuation of the property, real and personal, by counties, of the State of Virginia.

6. All moneys paid into the treasury of the Commonwealth from the counties included within the State of West Virginia during the period prior to the admission of the latter State into the Union.

· 7. The amount and value of all money, property, stocks and credits which West Virginia received from the Commonwealth of Virginia, not embraced in any of the preceding items and

---

[1] On June 1, THE CHIEF JUSTICE announced the appointment of Mr. Charles E. Littlefield, a member of the bar of this court as special master.

[2] A motion having been made to modify the decree this paragraph was amended by the court of June 1 so as to read "The extent and assessed valuation &c." and in all other respects the motion was overruled.

not including any property, stocks or credits which were obtained or acquired by the Commonwealth after the date of the organization of the restored government of Virginia, together with the nature and description thereof.

The answers to these inquiries to be without prejudice to any question in the cause.

It is further ordered that the Commonwealth of Virginia and the State of West Virginia shall each, when required, produce before the master, upon oath, all such records, books, papers and public documents as may be in their possession or under their control, and which may, in his judgment, be pertinent to the said inquiries and accounts, or any of them.

And the master is authorized to make, or cause to be made, such examination as he may deem desirable of the books of account, vouchers, documents and public records of either State relating to the inquiries he is herein directed to make, and to cause copies thereof or extracts therefrom to be made for use in making up his report.

All public records published by authority of the Commonwealth of Virginia prior to the seventeenth day of April, 1861, and all papers and documents and other matter constituting parts of the public files and records of Virginia prior to the date aforesaid, which in the judgment of the master may be relevant and pertinent to any of said inquiries, or copies thereof, if duly authenticated, may be used in evidence and considered by the master, but all such evidence shall be subject to exceptions to its competency. The public acts and records of the two States since the admission of West Virginia into the Union shall be evidence, if pertinent and duly authenticated, but all such evidence tendered by either party shall be subject to proper legal exceptions to its competency.

The master is empowered to summon any persons whose testimony he or either party may deem to be material, and to cause their depositions to be taken before him, or by a notary public or other officer authorized to take the same, after reasonable notice to the adverse party.

The master is authorized and empowered, subject to the approval of the Chief Justice, to employ such stenographers and other clerical assistants as he may find it desirable to employ in order to the prompt and efficient execution of this order of reference, and to agree with such stenographers and typewriters and clerical assistants upon such compensation to be made to them as the master may consider reasonable and just. He is authorized to direct their compensation to be paid out of the funds to be deposited to the credit of this cause.

The complainant shall cause the sum of five thousand dollars to be deposited with the marshal of this court to the credit of this cause, and such further sums as from time to time may be required, on account of the costs and expenses of executing this decree; and the master is authorized from time to time to draw upon the fund so deposited by Virginia for the compensation of the stenographers, typewriters and other clerical assistants whom he may employ, and for any other costs and expenses, including stationery and printing, which may in his judgment be necessary to be incurred in executing this order of reference.

The said marshal shall receive such commission for his services in receiving and disbursing the funds so deposited with him as may be allowed by the court, and he will make a report of his transactions, receipts and disbursements in the premises.

Any notices to be given in connection with the execution of this decree may be given by and to the Attorneys General of the respective States.

The master will make his report with all convenient speed and transmit therewith the evidence on which he proceeds, and is to be at liberty to state any special circumstances he considers of importance, and to state such alternative accounts as may be desired by either of the parties, subject to the direction of the court.

And the court reserves the consideration of the allowance of interest; of the costs of this suit, and all further directions until after the master has made his report; either of the parties to be at liberty to apply to the court as they shall be advised.